UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PIERRE KONOWALOFF<br>    Paris, France<br>              Plaintiff<br><br>v.<br><br><br>THE METROPOLITAN MUSEUM OF ART<br>    New York, New York<br>              Defendant. | ECF Case<br><br>10-cv-09126 (SAS) |

## COMPLAINT OF PIERRE KONOWALOFF

### Introduction

This is an action to recover a Cezanne painting *Madame Cezanne in the Conservatory*, or *Portrait of Madame Cezanne* (the "Painting"), confiscated by force and without compensation by Russia's former Bolshevik regime from its rightful owner, Pierre Konowaloff ("Mr. Konowaloff"). Mr. Konowaloff seeks an order granting him title and replevying the Painting, currently held by the Metropolitan Museum of Art (the "Museum"), accession no. 61.101.2, which acquired it with full knowledge of its unlawful taking and sale from Mr. Konowaloff's great grandfather, Ivan Morozov, of whom Mr. Konowaloff is the sole heir. As the Painting is rightfully Mr. Konowaloff's, it should be turned over to him, and the Museum held liable for monetary damages in connection with its wrongful acquisition, possession, display and retention of the Painting.

### THE PARTIES

1.     Pierre Konowaloff is an individual who resides in Paris, France.

2. On information and belief, the Metropolitan Museum of Art is a non-profit corporation organized under the laws of the state of New York.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a), because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. The Court has jurisdiction to grant the requested declaratory relief pursuant to 28 U.S.C. § 2201(a), 28 U.S.C. § 2202 and N.Y. C.P.L.R § 3001.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1)-(a)(2).

## FACTUAL BACKGROUND

6. Ivan Morozov ("Morozov"), Mr. Konowaloff's great-grandfather, acquired the Painting for value on or about April 29, 1911.

7. Mr. Konowaloff is the legitimate heir to all rights to the Painting. Morozov designated Eudoxie Morozov his sole heir. Eudoxie Morozov named Jean Konowaloff her sole heir; Jean Konowaloff in turn made Mr. Konowaloff his sole heir on March 18, 2002.

8. Morozov was a wealthy Moscow textile merchant whose collection of modern art was among the finest in Europe before World War I. Prior to the Bolshevik revolution, Morozov offered his art collection, including the Painting, for public exhibitions and maintained his collection so that the public could, and did, have access to it.

9. The Bolsheviks, or Russian Socialist Federated Soviet Republic ("RSFSR"), singled out Morozov and his art collection for confiscation. Leonid Krasin, an electrical engineer who headed Bolshevik criminal operations in bomb making, bank robbing, weapons smuggling, and extortion intended to raise funds for the party, had worked for the Morozovs and was familiar

with their property prior to the Russian Revolution. The Painting was taken by the RSFSR by order of Lenin and Sovnarkom (the Council of People's Commissars) in December 1918. Lenin's order singled out the art collections of two families, the Morozovs and the Ostroukhovs, cousins of the Morozovs. Although the Bolsheviks issued many decrees confiscating different kinds of private property, targeting one or two families was unusual.

10. The Bolsheviks confiscated virtually all of Morozov's property without compensating him. Morozov did not voluntarily relinquish the Painting. The Bolsheviks seized Morozov's home in Moscow and converted it into a state museum (the Second Museum of Modern Western Art) housing Morozov's entire art collection, including the Painting. Morozov's home was occupied by Red Guard soldiers, and he and his family were forced to live in several rooms on one floor. Morozov's home was looted of furniture.

11. Following the Bolshevik confiscation of his property, Morozov was compelled to serve as assistant director of his own collection in his own home (museum) under the supervision of curator Boris Ternovets and a political commissar. Penniless and bereft of his paintings, Morozov was driven into exile with his wife and daughter to England and then to France, where he died in 1921.

12. In the course of the Revolution, the Bolsheviks confiscated art objects, particularly of Tsarist origins, for possible sale abroad. In doing so, the Bolsheviks systematically destroyed evidence of title and origin, sometimes creating false ownership with new maker's marks. Leonid Krasin, Commissar of Foreign Trade, and the same person who had worked for the Morozov family before the revolution, was the main architect of the laundering system for these sales.

13. Krasin established and staffed the Soviet Trade Delegation in Berlin that served as the transit point for confiscated art being sold abroad. In 1928, the Matthiesen Gallery ("Matthiesen") in Berlin, headed by Franz Zatzenstein, became the main transit point for Soviet shipments of art for sale to the West. The Trade Delegation used Matthiesen to give the appearance of legitimacy to Soviet sales of looted art. Matthiesen was listed as an organization "involved in looting art" in the 1946 Final Report of the Art Looting Investigation Unit (ALIU) of the Office of Strategic Services (OSS).

14. By 1930, Matthiesen was receiving confiscated art from the Soviet government and transferring funds into Soviet accounts at banks in Berlin and Zurich. Matthiesen then would frequently transfer the paintings to P. & D. Colnaghi gallery in London ("Colnaghi") and from Colnaghi to Knoedler & Company ("Knoedler"), a gallery in New York City. These galleries handled the paintings on commission, normally 7.5 or 10%.

15. The partnership and conspiracy to sell Bolshevik looted art abroad involved, among others, the Soviet trade delegation in Berlin, Matthiesen (including Zatzenstein), Colnaghi and Knoedler in New York City (including Charles Henschel ("Henschel"), President of Knoedler), and, in this particular transaction, Stephen C. Clark, the benefactor of the Painting to Yale. Matthiesen regarded itself as part of Knoedler's operations. In or around 1930, Zatzenstein sent a letter to Henschel stating, "we [Matthiesen] are more or less since we started it a branch of Knoedler's, eagerly proceeding in the art to perform and exquisitely to display how to be successful in social communication with the Bolsheviki...."

16. Several wealthy American collectors, including Andrew Mellon ("Mellon"), Secretary of the Treasury under Herbert Hoover, acquired Bolshevik looted art on the black market. For example, between April 1930 and April 1931, Knoedler procured $6.6 million worth of

masterpieces from the Hermitage Museum in Moscow for Mellon through the Matthiesen connection. Zatzenstein wrote Henschel that Matthiesen had a "blocked account" so that the Soviet government could "get immediately a credit on the money which is owed to them, for the time until the delivery of the pictures."

17. Narkompros (the People's Commissariat for Public Enlightenment) leader Andrei Bubnov established a policy of "strict secrecy" regarding all Soviet art sales. Mellon wrote his son Paul in 1931 that "the whole affair is being conducted privately and it is important that this be kept confidential." As late as 1934, Mellon maintained that he had not purchased masterpieces confiscated by the Soviets. The press, however, reported that Mellon had paid $1.5 million for Raphael's *Alba Madonna*. In May 1935, Mellon's art purchases became public during his trial on charges of tax fraud related to the acquisition of these paintings.

18. Stephen C. Clark ("Clark") illegally acquired the Painting and three other artworks on or about May 9, 1933 in violation of Russian law and U.S. policy and/or law prohibiting such trades with Russia prior to U.S. recognition of Russia in November 19333, which was being specifically withheld because of Russia's policy of confiscations.

19. Clark, a lifelong resident of New York State, was born in 1882 in Cooperstown, New York, where his family owned most of the land and real property in the town. Clark was an heir of the Singer Manufacturing Company ("Singer") fortune. Clark became a director of Singer in 1906 and was aware of Singer's extensive holdings in Russia. Clark visited Russia after his graduation from Yale University in 1903 and is likely to have visited the Singer Building in St. Petersburg and the Singer factory in Podolsk, south of Moscow.

20. Clark was a sophisticated art collector. He began to purchase art in 1913, acquiring his first Renoir in 1916. Clark and his brother Sterling spoke of creating a museum in Cooperstown,

New York. Clark kept most of his collection in his town house on East 70th Street in New York. In 1929, Clark helped open the new Museum of Modern Art ("MoMA") in rented space in New York City. Clark frequently acquired paintings from Colnaghi of London and, as early as 1923, Knoedler of New York. Clark would become president and chairman of the board of MoMA and, in June 1932, a trustee of the Metropolitan Museum of Art.

21.     Alfred Hamilton Barr Jr. ("Barr") ils likely to have identified the Painting for Clark. Barr became the first director of MoMA in 1929. He often advised Clark on his art purchases. Barr traveled to Moscow in 1928, noting in his diary for January 8, 1928 that he had visited the Museum of Modern Art in Moscow, where the Painting hung at the time. Barr's diary also indicated that he knew that at least part of the collection in this museum had belonged to Morozov.

22.     Clark employed a Soviet laundering operation to acquire the Painting. Clark, while living in New York, directed Knoedler, a New York art gallery, secretly to purchase the Painting for him. On April 21, 1933, on behalf of Clark, Knoedler sent a cable from New York to Matthiesen in Berlin: "HAVE CLIENT DEFINITELY INTERESTED MADAME CEZANNE VAN GOGH CAFÉ RENOIR CHAMBERMAID DEGAS GREEN SINGER. CAN YOU NAME ATTRACTIVE PRICE FOR FOUR IN DOLLARS AS UNABLE TO BUY ANY MARKS IN QUANTITY HERE." The artworks purchased by Clark were as follows:

   1) Cezanne's *Portrait of Madame Cezanne* (ca. 1891), oil on canvas, purchased by Ivan Morozov April 28, 1911 from the Paris art dealer Ambroise Voillard for Fr. 50,000. Voillard had acquired the painting from Cezanne's son in 1909.

   2) Edgar Degas's *Singer in Green* (ca. 1884), pastel on light blue laid paper. M. Laurent sold the painting to the Paris art dealer Durand-Ruel on December 8, 1898 for Fr. 8,505. There were other owners until April 17, 1909, when Durand-Ruel sold the painting again to P.P. Riabushinsky of Moscow. Confiscated in 1918, the pastel went to the Tretiakov Gallery until 1925, when it was moved to the Museum of Modern Western Art.

    3) Renoir's *A Waitress at Duval's Restaurant* (1875). Durand-Ruel owned the painting from 1885 to 1906, when he sold it to Prince S.A. Shcherbatov (1874-1962) in 1912, who hung it in his Moscow home until 1918, when it was confiscated. Shcherbatov was a wealthy aristocrat, a member of the Tretiakov Gallery board, and the owner of a Moscow chamois leather factory. The painting went to the Rumiantsov Museum for "safekeeping" in 1924, then to the Museum of Modern Western Art.

    4) Van Gogh's *The Night Café* (1888), a painting of the Café de l'Alcazar. Purchased in Moscow by Ivan Morozov on June 23, 1908.

23. Clark probably wrote a check or money order to pay for the Painting to Knoedler in New York, which cabled the funds from New York to Matthiesen to deposit in a Soviet-controlled bank account in Berlin or Zurich. The Painting was then shipped from Berlin to London to Knoedler in New York. On or about May 9, 1933, Knoedler delivered the Painting to Clark in New York.

24. The commissions on the three paintings and the work on paper were: Knoedler $6,900, Colnaghi $2,300 and Matthiesen $2,300, totaling $11,500. The galleries never held title to the paintings, but only purchased for clients who purported to take title. The price for the three paintings and the work on paper purchased by Clark was approximately $260,000, which was a bargain price even by 1933 standards.

25. On May 19, 1933, ten days after Clark's payment to Knoedler to acquire the four artworks, the Politburo approved the sale over the protests of Andrei Bubnov, head of Narkompros, and other Soviet museum officials.

26. Clark almost certainly knew and, at the very least, should have known that the RSFSR and its successor, the USSR, had taken the Painting from Morozov without compensation. Clark, as a sophisticated buyer of works of art, knew or should have known that as early as 1933, United States courts had repeatedly ruled that the Bolshevik confiscations were unlawful.

27.  On November 16, 1933, approximately six months following Clark's illicit acquisition of the Painting, the United States officially recognized the Government of the Union of Soviet Socialist Republics pursuant to the Roosevelt-Litvinov Accords, a series of letters between President Franklin D. Roosevelt and the U.S.S.R.'s Maxim Litvinov.

28.  The Roosevelt-Litvinov Accords include the following provision:

> The Government of the Union of Soviet Socialist Republics further agrees ... not to make any claim with respect to:
>
> a. judgments rendered or that may be rendered by American courts in so far as they relate to property, or rights, or interests therein, in which the Union of Soviet Socialist Republics or its nationals may have had or may claim to have an interest; or,
>
> b. acts done or settlements made by or with the Government of the United States, or public officials in the United States, or its nationals, relating to property, credits, or obligations of any Government of Russia or nationals thereof.

29.  Clark concealed the provenance of the Painting. Following the illicit acquisition, Clark hung the Painting in his house until his death in 1960. He did not acknowledge the Morozov provenance until 1954 and never made any effort to provide notice to Morozov or his heirs that he possessed the Painting, although such notice could have been easily provided as it was common knowledge that the Morozov and other Russian émigrés were living in Paris. In 1954, Clark, as a MoMA trustee, opposed the prospective purchase of other artworks formerly of the Morozov collection from the Soviet Union, because of problems with the heirs of Mikhail Riabushinsky, owner of another of the pictures Clark obtained in 1933, Degas' *Green Singer*. Clark's estate also failed to provide notice to the Morozov family or their descendents of its possession of the Painting despite their likely knowledge of the Morozovs' whereabouts.

30.  Clark, in a will drawn under New York law, and probated in Surrogate's Court in Otsego County, New York, bequeathed the Painting to the Museum in 1960.

31. As one of the preeminent art museums in the world, the Museum knew that Clark's bequest involved looted art. Yet the Museum did nothing to (1) inquire as to whether Clark had good title; (2) locate the heirs of Ivan Morozov; and (3) ascertain whether the heirs to Ivan Morozov had received compensation for the Painting or had voluntarily given up any claims of title to the Painting.

32. When Clark made the bequest, the Museum, like all galleries and museums in the United States, had been put on notice by the U.S. State Department to avoid acquisition of any Nazi looted art. Allied Authorities had listed the Matthiesen as the chief "fence" or intermediary for the laundering of major Nazi looted art, especially that looted by Herman Goering, Commander in Chief of the Air Force. At the time of the Museum's acquisition of the Painting, it was well known by sophisticated purchasers of art, that Mr. Clark, in conjunction with Knoedler had engaged Matthiesen for the express purpose of serving as an intermediary for the laundering of Soviet sales of confiscated art.

33. Moreover, the Museum knew or should have known that Soviet law prohibited the alienation of Western art unless approved by the highest authorities (like the Mellon purchases) for significant sums of money to help deal with the Russian famine. The amount paid for the three paintings purchased by Clark was relatively insignificant, which makes it questionable that the sale was ever approved by the proper Soviet authorities.

34. As Clark never acquired lawful title, he could not bequeath lawful title to the Museum.

35. The United States' recognition of the USSR in November 1933 did not provide the USSR with good title to the Painting. The 1933 accords between the United States and the USSR served only to extinguish claims between the United States (including claims specifically assigned to it) and Russia. Most significantly, pursuant to those accords, Russia waived any

rights to make claims with respect to judgments rendered by United States courts as to property rights or interests of its nationals, including the rights of foreign nationals, like Pierre Konowaloff, to claim title to works of art held in the United States.

36. The Bolsheviks' selective takings of cultural property violated customary and conventional international law, including the Hague Convention (Regulations) Respecting the Laws and Customs of War on Land (1907) and the Lieber Code of 1863.

37. Since December 2008, a Russian Federation commission appointed by President Dmitry Medvedev has been investigating art sales abroad of 1928-33 as incompatible with prevailing Soviet law. Mikhail Piotrovsky, Hermitage Director since 1992, described the commission as intended "to raise and study the question to what extent the Soviet government's sale of artworks from museum collections was legal according to existing laws at that time."

38. Upon the death of his father in January 2002, Mr. Konowaloff became the official heir of the Morozov collection. He then undertook an exhaustive effort to document and inventory the artworks that had belonged to his great-grandfather, Ivan Morozov. Mr. Konowaloff's father had not undertaken such an inventory for a variety of reasons, including the well-founded belief that acting against Russia in connection with his grandfather's stolen art collection would subject him to danger and would be unavailing in terms of meaningful remedy available in Russia.

39. In the course of his compilation of the Morozov collection, Mr. Konowaloff learned through research in Russian museum archives that Mr. Clark purchased the Painting in the 1930's and bequeathed it to the Museum.

40. In May 2010, Mr. Konowaloff made demand for return of the painting upon the Museum. Mr. Konowaloff reiterated his demand in October 2010. To date, the Museum has refused to return the Painting.

## FIRST CLAIM

### (Replevin – N.Y. C.P.L.R. § 7101)

41. Mr. Konowaloff repeats and realleges the allegations contained in paragraphs 1-40 above as if fully set forth herein.

42. Mr. Konowaloff is the legitimate heir to all rights to the Painting and is entitled to it immediate possession.

43. Ivan Morozov acquired the Painting on or about April 29, 1911 for good value. The Painting was confiscated by the RSFSR in 1918, in an act of theft. Morozov did not voluntarily relinquish the Painting.

44. Stephen C. Clark acquired the Painting in 1933 but did not obtain good title to it. The Museum obtained the Painting through a bequest from Mr. Clark and did not obtain good title to it.

45. Mr. Konowaloff has requested that the Museum return the Painting to him as the rightful owner and the Museum has refused.

46. The Museum's continued possession and refusal to return the Painting despite Mr. Konowaloff's request constitute a wrongful detention of property.

47. As a result of the Museum's actions, Mr. Konowaloff has suffered monetary damages in an amount in excess of $75,000.

## SECOND CLAIM

### (28 U.S.C. §§ 2201, 2202 and N.Y. C.P.L.R. § 3001 – Declaratory Relief)

48. Mr. Konowaloff repeats and realleges the allegations contained in paragraphs 1-46 above as if fully set forth herein.

49. An actual controversy has arisen and now exists between Mr. Konowaloff and the Museum in that Mr. Konowaloff contends that he is the rightful owner of the Painting and that

the Museum is in wrongful possession of the Painting. The Museum disputes Mr. Konowaloff's contentions and asserts that it lawfully possesses the Painting and therefore does not need to return it to Mr. Konowaloff.

50. A judicial declaration is necessary and appropriate at this time under the circumstances so that Mr. Konowaloff may ascertain whether the Museum must immediately return the Painting to Mr. Konowaloff and/or is liable to Mr. Konowaloff for monetary damages.

## THIRD CLAIM

### (Conversion at New York Common Law)

51. Mr. Konowaloff repeats and realleges the allegations contained in paragraphs 1-49 above as if fully set forth herein.

52. Mr. Konowaloff is the legitimate heir to all rights to the Painting and has the right to its immediate possession.

53. The Museum currently exercises unauthorized dominion over the Painting.

54. The Museum's continued possession of the Painting is to the wrongful exclusion of Mr. Konowaloff's rights.

55. As a result of the Museum's actions, Mr. Konowaloff has suffered monetary damages in an amount greater than $75,000.

## FOURTH CLAIM

### (Injunctive Relief against the Museum)

56. Mr. Konowaloff repeats and realleges the allegations contained in paragraphs 1-60 above as if fully set forth herein.

57. Konowaloff seeks injunctive relief: (1) enjoining the Museum and its agents and those acting in concert with its from selling, copying, destroying, altering, damaging, transferring and

disposing of the painting in any manner whatsoever; and (2) mandating the immediate return of the Painting to Mr. Konowaloff.

58. There is a likelihood that Mr. Konowaloff will prevail on the merits of his claims.

59. There is a substantial threat that Mr. Konowaloff will continue to suffer irreparable injury or harm if the requested injunction is denied because the Painting is unique and irreplaceable.

60. Damages would be an inadequate legal remedy due to the unique and irreplaceable nature of the Painting.

61. The harm to Mr. Konowaloff outweighs any damage the injunction might cause to the Museum, and the public interest favors issuance of the injunction. The hardship to the Museum is minimal.

**WHEREFORE**, Pierre Konowaloff respectfully requests that this Court enter judgment in his favor and against the Museum, and award him all relief as allowed by law and equity, including but not limited to, the following:

a. Appropriate legal and equitable relief, including but is not limited to a declaration that Konowaloff has good and full title to the Painting and that the Museum is in the wrongful possession of the Painting;

b. Injunctive relief, including but not limited to an order (1) enjoining the Museum and their respective agents and those acting in concert with them from selling, copying, destroying, altering, damaging, displaying, transferring or disposing of the painting in any manner whatsoever; and (2) mandating that the Museum immediately return the painting to Mr. Konowaloff;

c. Actual economic damages as established at trial;

d. Compensatory damages, including but not limited to damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e. For a writ of replevin ordering the Museum to turn over the Painting to Mr. Konowaloff;

f. Attorneys' fees and costs;

g. Pre- and post- judgment interest at the highest lawful rate; and

h. Such other and further relief as justice requires.

## REQUEST FOR TRIAL BY JURY

Mr. Konowaloff requests a trial by jury on all issues and claims triable by a jury.

Dated: 12/2/10

Respectfully submitted,
Pierre Konowaloff,
By his attorneys,

Rory Z. Fazendiero (RF3215)
Philip Y. Brown (Pro Hac Vice Pending)
Adam M. Weisberger (Pro Hac Vice Pending)
Adler Pollock & Sheehan P.C.
175 Federal Street
Boston, MA  02110
Phone: 617-482-0600
Fax: 617-482-0604
pbrown@apslaw.com
rfazendiero@apslaw.com

Paul V. Curcio (Pro Hac Vice Pending)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, R.I. 02903
Phone: 401-274-7200
Fax: 401-751-0604
pcurcio@apslaw.com

Allan Gerson (Pro Hac Vice Pending)
AG International Law
2131 S St. NW
Washington, D.C. 20008
Phone: 202-234-9717
Fax: 202-234-9727
ag@ag-il.com

Of Counsel
Linda A. Malone (Pro Hac Vice Pending)
Marshall-Wythe Foundation Professor of
Law and Director, Human Rights and
National Security Law Program
William & Mary Law School
P. O. Box 8795
Williamsburg, VA 23187-8795
Telephone: (757) 221-3844
Fax: (757) 221-3261
lindamalon@aol.com