UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PIERRE KONOWALOFF<br>    Paris, France<br>            Plaintiff<br>v.<br>THE METROPOLITAN MUSEUM OF ART<br>    New York, New York<br>            Defendant. | 10-CV-9126 (SAS)<br><br>ECF Case<br><br>Oral Argument Requested |

**REPLY BRIEF IN FURTHER SUPPORT OF
DEFENDANT THE METROPOLITAN MUSEUM OF ART'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.   THE ACT OF STATE DOCTRINE BARS PLAINTIFF'S CLAIMS ...................................................... 1

    A.   The Act Of State Doctrine Requires Dismissal Because
The Decree Was An Official Act Of The Soviet Government
Taken Within Its Own Jurisdiction ....................................................................................... 1

    B.   U.S. Courts Have Uniformly Applied The Act Of State
Doctrine To Validate Soviet Nationalization Decrees .......................................................... 3

    C.   The Applicability Of The Act Of State Doctrine Under
Long-Standing Precedent Is Established Within The Four
Corners Of The Complaint .................................................................................................... 5

II.  THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFF'S CLAIMS ....................................... 8

III. THE DOCTRINE OF INTERNATIONAL COMITY BARS PLAINTIFF'S CLAIMS ........................... 9

IV.  THE STATUTES OF LIMITATIONS AND LACHES BAR PLAINTIFF'S CLAIMS .......................... 9

CONCLUSION ............................................................................................................................ 10

## TABLE OF AUTHORITIES

### CASES

*432 Broome St., LLC v. Bullen*,
  270 A.D.2d 130 (1st Dep't 2000) .................................................................................. 10

*Agudas Chasidei Chabad of United States v. Russian Federation*,
  466 F. Supp. 2d 6 (D.D.C. 2006) ..................................................................................... 6

*Agudas Chasidei Chabad of United States v. Russian Federation*,
  528 F.3d 934 (D.C. Cir. 2008) ..................................................................................... 6, 8

*Bakalar v. Vavra*,
  619 F.3d 136 (2d Cir. 2010) ............................................................................................ 4

*Baker v. Carr*,
  369 U.S. 186 (1962) ..................................................................................................... 7, 9

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964) ..................................................................................................... 6, 8

*Bigio v. Coca-Cola Co.*,
  239 F.3d 440 (2d Cir. 2000) ......................................................................................... 7, 9

*Braka v. Bancomer, S.N.C.*,
  762 F.2d 222 (2d Cir. 1985) ............................................................................................ 5

*Finanz AG Zurich v. Banco Economico S.A.*,
  192 F.3d 240 (2d Cir. 1999) ............................................................................................ 9

*Fitzpatrick v. Sony-BMG Music Entertainment, Inc.*,
  No. 07 Civ. 2933, 2007 WL 2398801 (S.D.N.Y. Aug. 15, 2007) ................................. 10

*Friedar v. Government of Israel*,
  614 F. Supp. 395 (S.D.N.Y. 1985) .................................................................................. 5

*In re Maxwell Communication Corp.*,
  93 F.3d 1036 (2d Cir. 1996) ............................................................................................ 9

*Khulumani v. Barclay National Bank Ltd.*,
  504 F.3d 254 (2d Cir. 2007) ............................................................................................ 9

*McKenna v. Wright*,
  386 F.3d 432 (2d Cir. 2004) ............................................................................................ 5

*Oetjen v. Central Leather Co.*,
  246 U.S. 297 (1918) ............................................................................................................. 4

*Ricaud v. American Metal Co.*,
  246 U.S. 304 (1918) ............................................................................................................. 4

*Salimoff & Co. v. Standard Oil Co. of New York*,
  262 N.Y. 220 (1933) .................................................................................................... 2, 3, 5

*Stroganoff-Scherbatoff v. Weldon*,
  420 F. Supp. 18 (S.D.N.Y. 1976) ......................................................................................3, 5

*United States v. Belmont*,
  301 U.S. 324 (1937) ................................................................................................... 3, 5, 6, 8

*United States v. Pink*,
  315 U.S. 203 (1942) ................................................................................................... 3, 4, 5, 8

*United States v. Portrait of Wally*,
  663 F. Supp. 2d 232 (S.D.N.Y. 2009) .................................................................................. 7

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., International*,
  493 U.S. 400 (1990) ...................................................................................................... *passim*

## STATUTES

18 U.S.C. § 2315 ........................................................................................................................ 10

N.Y. C.P.L.R. 202 ..................................................................................................................... 10

Plaintiff has now had two opportunities to state a claim—but has failed both times. His opposition brief offers only lame, ineffective responses to the Metropolitan Museum of Art's showing that dismissal is required on four independent grounds.

Most centrally, the **act of state doctrine** requires dismissal under a substantial body of on-point precedents. The 1918 Nationalization Decree ("Decree") was a valid act of state that vested ownership of the Painting in the Soviet government, depriving Morozov and his heirs of all rights to the Painting. Plaintiff labors to distinguish what he calls "outdated" decisions of the Supreme Court, the New York Court of Appeals, and this Court that have recognized similar Soviet nationalization decrees as valid acts of state, but these precedents are fully consistent with current act of state jurisprudence. Nor can plaintiff avoid the Decree by asserting that it was issued by "Bolshevik" "criminals"; the Supreme Court long ago interred that thesis, twice recognizing the validity of nationalization decrees issued by the same Bolshevik authorities in 1918 and 1919. Finally, plaintiff cannot avoid dismissal by otherwise painting the Decree as unique and unlawful; the act of state doctrine is intended to avoid such inquiries by U.S. courts, and even if such an inquiry were proper, plaintiff's claims are easily resolved in the Museum's favor on the pleadings. Plaintiff's attempts to create phantom issues of fact to permit his claims to survive are all meritless. (*Infra*, Part I.) Plaintiff's claims also must be dismissed on the basis of the **political question doctrine** (*infra*, Part II) and **international comity** (*infra*, Part III), and because they are time-barred under **the statutes of limitations and laches** (*infra*, Part IV).

## I.    THE ACT OF STATE DOCTRINE BARS PLAINTIFF'S CLAIMS

### A.    The Act Of State Doctrine Requires Dismissal Because The Decree Was An Official Act Of The Soviet Government Taken Within Its Own Jurisdiction

The act of state doctrine "requires that … the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.,*

*Int'l*, 493 U.S. 400, 409 (1990).  The original Complaint plainly stated each element:  (1) "The Painting was taken by the RSFSR," *i.e.*, the Soviet government, then known as the Russian Socialist Federated Soviet Republic, (2) "by order of Lenin and Sovnarkom (the Council of People's Commissars)," through an official act, (3) in Moscow, *i.e.*, within the RSFSR's own jurisdiction.  Compl. ¶¶ 8-9.  When the Museum asserted an act of state defense, *see* Mot. at 5-16, plaintiff amended the Complaint to suggest that "the Bolsheviks," rather than the RSFSR, had issued the Decree.  Am. Compl. ¶ 11.  This pleading artifice fails for a host of reasons.

First, plaintiff cannot avoid the official nature of the Decree simply by using the term "Bolsheviks" in place of the RSFSR.  *See Salimoff & Co. v. Standard Oil Co. of N.Y.*, 262 N.Y. 220, 227 (1933) ("To refuse to recognize that Soviet Russia is a government regulating the internal affairs of the country, is to give to fictions an air of reality which they do not deserve."); Def. Mem. 10-11.  Nor does it matter if "the Moscow Cheka … and Narkompros" executed the taking.  *See* Am. Compl. ¶ 11; Opp. 1.  These government actors' involvement, even if true, does not negate the fact that the Painting was taken pursuant to an official nationalization decree of the RSFSR.[1]  Second, the Amended Complaint still contains a slew of allegations demonstrating

---

[1] Plaintiff is audaciously wrong to suggest that he "stated facts" in the *Yale* case "demonstrating that the taking was not an official act."  Opp. 9 n.4.  The passages he cites—part of his statement of disputed issues—in fact state that Morozov's art collection "was taken by the *new Soviet government of Russia* by order of Lenin and Sovnarkom," and that "*the government also seized* Morozov's home in Moscow and converted it into a *state museum*."  Statement of Material Facts re Motion for Summary Judgment on Counterclaims, *Yale Univ. v. Konowaloff*, Case No. 3:09-cv-00466 ("*Yale* case") (D. Conn. Oct. 29, 2010), Dkt. 80, ¶¶ 8, 9 (emphasis added).  And, in his Amended Answer in that case, plaintiff expressly "admit[s]" that Morozov's art collection was taken "by the Russian government."  *See id.*, Dkt. 35, ¶¶ 3, 63, 68 (Def.'s First Am. Answer and Am. Counterclaim); *id.*, Dkt. 1, ¶ 68 (Compl.).  Furthermore, in his Amended Counterclaim there, plaintiff affirmatively relies upon and quotes the Decree, alleging that:
> On December 19, 1918, the Morozov family property, including its antiques and art works, was *declared the property of the RSFSR*.  Sovnarkom (Council of People's Commissars) ruled that the "art collections of I.A. Morozov, I.S. Ostroukhov, and V.I. Morozov"

that the Decree was an official act of the RSFSR.² Third, courts have uniformly concluded that Soviet nationalization decrees, including some issued before the Decree here, were acts of the Soviet government. *See United States v. Pink*, 315 U.S. 203, 217 n.2, 218 n.3 (1942) (decrees of June 28, 1918 and November 28, 1918); *United States v. Belmont*, 301 U.S. 324 (1937); *Stroganoff-Scherbatoff v. Weldon*, 420 F. Supp. 18 (S.D.N.Y. 1976); *Salimoff*, 262 N.Y. 220.

### B. U.S. Courts Have Uniformly Applied The Act Of State Doctrine To Validate Soviet Nationalization Decrees

The Supreme Court, this Court, and the New York Court of Appeals have all held that Soviet nationalization decrees—issued by the same authorities that issued the Decree—are valid acts of state that vested in the Soviet government the ownership rights to certain private property. *See Pink*, 315 U.S. 203; *Belmont*, 301 U.S. 324; *Stroganoff-Scherbatoff*, 420 F. Supp. 18; *Salimoff*, 262 N.Y. 220. *Kirkpatrick*, on which plaintiff relies (*e.g.*, Opp. 6), did not overrule, undermine, or even mention, *Belmont* or *Pink*; nor did it disturb existing act of state doctrine. Rather, *Kirkpatrick* delivers another fatal blow to plaintiff's case. It reiterates that "the acts of foreign sovereigns taken within their own jurisdiction shall be deemed valid," 493 U.S. at 409, and requires courts to apply this doctrine as a "principle of decision" where "the outcome of the case turns upon [] the effect of official action by a foreign sovereign," *id.* at 406. For example,

---

were "*state property*," to be "transferred to the jurisdiction of the People's Commissariat of Enlightenment" (Narkompros). *Signed by Lenin*, the decree also ordered Narkompros to "*put into action a statute* about the use of the collections *in accord with* the contemporary needs and tasks involved in democratizing the artistic and educational-cultural *institutions of the RSFSR*."

*Id.*, Dkt. 35 at ¶ 17 (quoting Decree) (emphasis added); *see also id.* at 13-14 (First Aff. Defense).
² *See* Am. Compl. ¶ 57 ("The Painting *was confiscated by the RSFSR in 1918* …."); ¶ 14 ("1918 *order* was tantamount to a *bill of attainder* …."); ¶ 35 ("Clark may have known that *the RSFSR and its successor, the USSR, had taken the Painting from Morozov* without compensation."); ¶ 52 (referring to the "heir of another [art] collection *taken … by the RSFSR in 1918*"); ¶ 33 (alleging that 1933 sale "violated the *1918 laws* … that guaranteed former owners of *nationalized property* that their property would be safe and secure under *state control* … and *laws against stealing state (museum) property* belonging to the people") (all emphases added).

the Court refused to invalidate title to property obtained from Mexico in *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302-03 (1918), and *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 308-09 (1918), on the ground that doing so "would have required declaring that government's prior seizure of the property, within its own territory, legally ineffective." *Kirkpatrick*, 493 U.S. at 405. This principle of decision is fatal to plaintiff's claims here, where the outcome turns on the validity of the RSFSR's Decree, which "deprived [Morozov] of all his property rights and interests in the Painting," Am. Compl. ¶ 11.

Equally off-base is plaintiff's notion (Opp. 8) that the case turns on whether Morozov "voluntarily relinquished" the Painting. For this, plaintiff relies on a separate concurring opinion in *Bakalar v. Vavra*. 619 F.3d 136, 148 (2d Cir. 2010) (Korman, J., concurring and describing his opinion as *dicta*). *Bakalar*, however, turned on a *factual dispute* over whether the Nazis had taken certain artworks, *see id.* at 146-47 (majority opinion); that is not the question here. It is undisputed that the Painting was taken from Morozov; this case turns on the legal validity of a Soviet nationalization decree—an utterly separate issue already decided by the Supreme Court. As the Court has observed, *Bakalar* was a "Nazi art case" that is "completely distinguishable." Tr. of Scheduling Conference at 14 (Jan. 25, 2011) (hereinafter Conf. Tr.). The act of state doctrine as applied in *Belmont* and *Pink* thus controls this case.[3]

---

[3] Plaintiff's attempt (Opp. 7) to distinguish those cases based on their treatment of the Roosevelt-Litvinov Agreements can be swiftly put aside. As this Court has recognized, the Soviet Government promised in those Agreements not to make a claim based on U.S. court judgments regarding property rights covered by the assignment to the United States; it clearly did not renounce its ownership of nationalized property. Conf. Tr. at 9. Nor did the Soviet Government agree to limit or repudiate the validity and enforceability of its nationalization decrees; to the contrary, the purpose of those Agreements was, among other things, to recognize the validity of Soviet nationalization decrees in order to facilitate assigning some portion of nationalized property to the United States. *See Pink*, 315 U.S. at 224 n.7. Plaintiff's attempt to confine *Belmont* and *Pink* to their facts ignores the Agreements' plain language, their treatment in *Belmont* and *Pink*, their historical context, and the Museum's explanation of why their waiver

Finally, plaintiff argues (Opp. 7) that the Decree differs from the decrees deemed valid in *Stroganoff-Scherbatoff* and *Salimoff* because here, unlike in those cases, "the legitimacy of confiscatory acts are in question and … adjudication presents no risk of injury to U.S.-Russian relations." But of course, the takings' legitimacy was precisely what was at issue in both cases. And plaintiff's *ipse dixit* that the adjudication here presents no risk of injury to U.S.-Russian relations cannot make it so. *See infra* at 7 (risk of injury to foreign relations). Plaintiff also does not contest that the nationalization decrees upheld in *Stroganoff-Scherbatoff*, 420 F. Supp. at 21-22, would independently have nationalized the Painting here, *see* Def. Mem. 14; *see also* Am. Compl. ¶ 13 (alleging issuance of decrees upheld in *Stroganoff-Scherbatoff*). Thus, his attempts to undermine the Decree are futile as well as meritless: even without the Decree, the Painting still would have been nationalized under those two previously upheld decrees.

### C. The Applicability Of The Act Of State Doctrine Under Long-Standing Precedent Is Established Within The Four Corners Of The Complaint

This Court may dismiss the Amended Complaint on act of state grounds under Rule 12(b)(6) because the defense "appears on the face of the complaint," *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (citation and internal quotation marks omitted).[4] The pleadings establish that the Decree was an official act of a foreign government (the RSFSR) taken within its own jurisdiction, which, under the doctrine, constitutes an act of state that must be deemed valid. *See Kirkpatrick*, 493 U.S. at 409; *Pink*, 315 U.S. 203; *Belmont*, 301 U.S. 324; *Stroganoff-Scherbatoff*, 420 F. Supp. 18; *Salimoff*, 262 N.Y. 220.

Attempting to create factual issues and thereby avoid dismissal, plaintiff contends that the application of the doctrine additionally depends on (1) whether the U.S.S.R. is "extant and

---

provision is irrelevant. *See* Def. Mem. 6-7, 14-15.

[4] *See also, e.g.*, *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225-26 (2d Cir. 1985) (affirming dismissal of complaint on act of state grounds); *Friedar v. Gov't of Israel*, 614 F. Supp. 395, 399-400 (S.D.N.Y. 1985) (act of state defense alternative grounds for dismissal of complaint).

recognized," and (2) whether adjudication of this case will impact foreign relations. Opp. 10-13. That is wrong. The Supreme Court by no means "mandated" (Opp. 6) that courts consider these or any other questions before applying the act of state doctrine; and it did not instruct courts to do so in the face of its own longstanding precedent directly on point. *See Kirkpatrick*, 493 U.S. at 409 (discussing "suggest[ions]" made in *dicta* in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964)).

Even if such additional inquiry were permissible, it would not lead to plaintiff's desired result. First, it is beside the point that the U.S.S.R. is no longer "extant." The relevant and undisputed facts are that the Russian Federation is the successor to the RSFSR,[5] and that the Supreme Court has applied the act of state doctrine retroactively to RSFSR nationalization decrees, *see, e.g.*, *Belmont*, 301 U.S. at 330 ("The effect of [the President's recognition of the Soviet government] was to validate, so far as this country is concerned, all acts of the Soviet government here involved from the commencement of its existence."). Where, as here, the political branches have already addressed the issue, it is their decision whether to reopen it. Contrary to plaintiff's suggestion (Opp. 11), the D.C. Circuit acknowledged that it was not "qualified" to engage in a "political evaluation of the character of the regime change" following the collapse of the U.S.S.R., which would "likely … entail just the implications for foreign affairs that the [act of state] doctrine is designed to avert." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 954 (D.C. Cir. 2008). Indeed, as that court noted, the only courts

---

[5] *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 466 F. Supp. 2d 6, 13 n.7 (D.D.C. 2006) ("RSFSR … was one of the fifteen former Soviet Republics …. After the collapse of the Soviet Union, the RSFSR effectively became what today is the Russian Federation."); *see also* Def.'s First Am. Answer and Am. Counterclaim, *Yale* case, Dkt. 35, ¶ 79; *id.*, Dkt. 1 (Compl.), ¶ 79 ("The Congress of Soviets of the RSFSR voted to secede from the Soviet Union on December 12, 1991, and the RSFSR was renamed the Russian Federation on December 25, 1991.").

to decline to apply the act of state doctrine based on a change in government have done so where the new regime had repudiated the acts of the old. *Id.*; *see also* Def. Mem. 16.[6]

Second, contrary to plaintiff's wishful claim (Opp. 11), it is plain from the pleadings that adjudication of plaintiff's claims would impact U.S. foreign relations. *See* Def. Mem. 19-20. Jettisoning long-established precedent regarding Soviet nationalization decrees would call into question long-settled decrees and titles to property resolved under these decrees, and would plainly risk upsetting the Russian Federation, which, plaintiff admits, itself owns much "private property" taken pursuant to "many decrees." Am. Compl. ¶¶ 13-14. Further, there would be no "judicially discoverable and manageable standards" by which a court could distinguish between valid and invalid nationalization decrees. *See Baker v. Carr*, 369 U.S. 186, 217 (1962).

Claiming that this case poses "no risk" to U.S.-Russian relations, plaintiff relies (Opp. 11) on *Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2000). But *Bigio* is distinguishable. Decisive there was the fact that the current Egyptian government had "apparently repudiated the acts in question" and had even "sought to have the property or its proceeds returned to the [plaintiffs]." *Id.* at 453. Under those circumstances, the Second Circuit declined to apply the act of state doctrine only because it was obvious that there was *no chance* that a judicial decision could offend the Egyptian government or upset U.S. foreign relations. Here, of course, the circumstances are the opposite. The Russian Federation has never repudiated its predecessor's nationalization decrees, and plaintiff makes no claim to the contrary. Far from it: As plaintiff acknowledges, the Russian Federation still holds property taken pursuant to such decrees.[7] As a matter of law, the act of state doctrine therefore requires dismissal.

---

[6] *United States v. Portrait of Wally*, on which plaintiff relies (Opp. 6), falls into this category. *See* 663 F. Supp. 2d 232, 248 (S.D.N.Y. 2009).

[7] Indeed, plaintiff has alleged here that the Soviet government took (and retains today in

- 7 -

Plaintiff's other attempts to identify open fact questions are similarly misplaced.[8] And plaintiff's claim (Opp. 12-13) that the Decree was "religiously motivated" is contrary to his own allegations (*see* Def. Mem. 13-14) and beside the point. A government's alleged motivation has no bearing on the act of state analysis, *see Sabbatino*, 376 U.S. at 429-31; *Belmont*, 301 U.S. at 332, which does not require courts "to embark on a path of ranking violations of international law on a spectrum, dispensing with [the doctrine] for the vilest," *Chabad*, 528 F.3d at 955.

## II.     THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFF'S CLAIMS

Plaintiff has said nothing to undermine the Museum's showing that each of the six *Baker* factors bars his claims. *See* Def. Mem. 18-20. And plaintiff's assertion that this case does not involve a "textually demonstrable constitutional commitment of the issue to a coordinate political department" (Opp. 13) directly contradicts the Supreme Court's clear statement in *Pink* that the President's foreign relations powers "include[] the power … to determine the public policy of the United States with respect to the Russian nationalization decrees," 315 U.S. at 229. This factor alone supports the political question doctrine's application here.

---

"Russian museums' inventories") a vast amount of private property, including untold numbers of "artworks" and even "masterpieces." *See* Am. Compl. ¶¶ 13-15, 29, 33, 52. In the *Yale* case, plaintiff has admitted that the Russian Federation continues to defend Soviet-era nationalization decrees. Def.'s First Am. Answer and Am. Counterclaim, *Yale* case, Dkt. 35, ¶¶ 81-83; *id.*, Dkt. 1 (Compl.), ¶¶ 81-83. There is no basis to suppose that the Russian Federation supports repudiation of Soviet nationalization decrees that would result in its relinquishing such artwork.

[8] Implying that the Decree was not an official act of state, plaintiff claims that (1) it served no legitimate government purpose, (2) "Bolshevik criminals" took Morozov's collection, (3) the Decree "singl[ed] out Morozov's art collection," and (4) the Cheka seized Morozov's art for sale abroad. Opp. 9. For the reasons explained in the Museum's motion to dismiss, to which plaintiff does not respond, none of these allegations, even if true, would undermine the Decree's official character. Def. Mem. 10-18. Similarly, regardless of whether any wars were underway and "[w]hether the Bolsheviks were an army" (*see* Opp. 12), *Belmont*, *Pink*, and their progeny have long recognized the validity of Bolshevik takings at the same time, under the same conditions, and by the same authorities who allegedly took the Painting here. Even if there had been a war underway, it would be irrelevant because plaintiff alleges no connection between any supposed war and the nationalization of the Painting. Moreover, the Hague Conventions speak only to international wars between states party to the Conventions, and say nothing about nationalizations of property belonging to a state's *own nationals*. *See* Def. Memo. 13-14.

Indeed, plaintiff would have this Court decide not only the validity of the Decree, but also additional political questions, including (1) the nature of the Russian regime change in 1991, and (2) whether the United States and the RSFSR were engaged in an "undeclared war" in 1918. Both involve issues that the Constitution commits to the political branches and that require "an initial policy determination of a kind clearly for nonjudicial discretion," *Baker*, 369 U.S. at 217; *see id.* at 212-13 (recognition of foreign governments and of war are political questions).

### III. THE DOCTRINE OF INTERNATIONAL COMITY BARS PLAINTIFF'S CLAIMS

It is fully within this Court's discretion to grant this motion to dismiss on the basis of international comity.  *See Bigio*, 239 F.3d at 454-55.  International comity does not require that the case involve statutory interpretation or a simultaneously pending foreign suit.  *Cf.* Opp. 16. And where, as here, comity would not be used to recognize a foreign judgment, the doctrine does not turn on "whether foreign proceedings violate [U.S.] laws or public policy." *Id.* (citing *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999)).[9]  Rather, the doctrine involves a broader inquiry into U.S., Russian, and international systemic interests. *See In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1048 (2d Cir. 1996); *id.* at 1051-53 (analyzing these three interests).  The Museum enumerated these interests in its motion to dismiss (Def. Mem. 20-21); they exist regardless whether the governments make an official statement. *See, e.g.*, *id.* (affirming dismissal on international comity grounds without U.S. or U.K. statement).

### IV. THE STATUTES OF LIMITATIONS AND LACHES BAR PLAINTIFF'S CLAIMS

Plaintiff concedes (by not contesting) that a bad-faith purchaser is not subject to the demand-and-refusal rule.  But he then runs from his own allegations of the Museum's bad faith.

---

[9] Nor does Judge Korman's opinion in *Khulumani* stand for this proposition. *Cf.* Opp. 16; *see Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 299 (2d Cir. 2007) (Korman, J., concurring in part and dissenting in part); *id.* at 263-64 (*per curiam*) (declining to address international comity and rejecting Judge Korman's analysis).

- 9 -

*See*, *e.g.*, Am. Compl. at 1 (alleging Museum "acquired [the Painting] with full knowledge of its unlawful taking"). These allegations accuse the Museum not only of acting in bad faith, but of committing a federal crime. *See* 18 U.S.C. § 2315 (criminalizing receipt of property "knowing [it] to have been stolen, unlawfully converted, or taken"). Plaintiff's only response (Opp. 18) is that he *also* alleges that Clark's bequest to the Museum was legal. The demand-and-refusal rule, however, depends not on the legality of a bequest, but on allegations of "bad faith," *i.e.*, that the Museum knew of the Painting's "unlawful taking." *See, e.g.*, *432 Broome St., LLC v. Bullen*, 270 A.D.2d 130, 130 (1st Dep't 2000). The pleadings allege as much, so the demand-and-refusal rule does not apply.[10] Plaintiff's claims therefore expired decades ago. *See* Def. Mem. 22-24.

Finally, laches bars plaintiff's claims. *See* Def. Mem. 24-25. Plaintiff says nothing (Opp. 20) to justify the passage of nearly a century before he or his ancestors ever brought a claim. He does not explain, for example, (1) why returning to Russia was necessary to research or assert a claim; (2) why the family could not have learned any time after 1991 what the heir to another collection learned in 2008; or (3) why it took from 2002 to 2008 to discover plaintiff's alleged interest in the Painting. Like the act of state defense, dismissal based on laches is appropriate where, as here, the laches defense appears on the face of the pleadings. *See, e.g.*, *Fitzpatrick v. Sony-BMG Music Entm't, Inc.*, No. 07 Civ. 2933, 2007 WL 2398801, at *3-4 (S.D.N.Y. Aug. 15, 2007) (Scheindlin, J.) (granting motion to dismiss claims based on laches).

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice and the Court should award any additional relief to the Museum as it may deem appropriate.

---

[10] Plaintiff also does not contest the applicability of New York's borrowing statute, CPLR 202, or otherwise explain why dismissal is not also required under French and/or Russian law, *see* Def. Mem. 22-23.

Dated:  June 6, 2011

                                        Respectfully submitted,

                                        /s/ David W. Bowker
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363
Email: david.bowker@wilmerhale.com

Paul A. Engelmayer
Pamela K. Bookman
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 230-8888
Email: paul.engelmayer@wilmerhale.com

*Attorneys for Defendant*
The Metropolitan Museum of Art