**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PIERRE KONOWALOFF<br>　　　Paris, France<br>　　　　　　Plaintiff<br>v.<br>THE METROPOLITAN MUSEUM OF ART<br>　　　New York, New York<br>　　　　　　Defendant. | 10-CV-9126 (SAS)<br><br>ECF Case<br><br>Oral Argument Requested |

**BRIEF OF DEFENDANT THE METROPOLITAN MUSEUM OF ART**
**IN RESPONSE TO BRIEF *AMICI CURIAE* OF CENTER FOR HUMAN RIGHTS AND**
**GENOCIDE STUDIES, FILIPPA M. ANZALONE, MICHAEL BERENBAUM,**
**CHRISTIAN DEFRANCIA, EDWARD M. GAFFNEY, JR., GREGORY S. GORDON,**
**MICHAEL J. KELLY, JORDAN J. PAUST, PAMMELA Q. SAUNDERS,**
**KRISTA SIGLER, RONALD G. SUNY & FRITZ WEINSCHENK**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

I. THE ACT OF STATE DOCTRINE BARS PLAINTIFF'S CLAIMS....................................................... 2

    A. The Act Of State Doctrine Plainly Applies To The 1918
       Nationalization Decree............................................................................................ 2

    B. Whether The Act of State Doctrine Is Broad Or Narrow,
       The 1918 Nationalization Decree Lies At Its Heart............................................... 9

II. PLAINTIFF'S CLAIMS ARE BARRED BY THE DOCTRINE OF LACHES ....................................... 11

CONCLUSION...................................................................................................................... 12

## TABLE OF AUTHORITIES

### CASES

*Agudas Chasidei Chabad of United States v. Russian Federation*,
   528 F.3d 934 (D.C. Cir. 2008) .......................................................................... 6, 8

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
   425 U.S. 682 (1976) ............................................................................................ 4, 5

*Baker v. Carr*,
   369 U.S. 186 (1962) ............................................................................................ 8, 9

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ................................................................................. 3, 4, 6, 11

*Bigio v. Coca-Cola Co.*,
   239 F.3d 440 (2d Cir. 2000) ............................................................................. 4, 6, 7

*Bodner v. Banque Paribas*,
   114 F. Supp. 2d 117 (E.D.N.Y. 2000) ............................................................... 6, 7

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*,
   433 F.2d 686 (2d Cir. 1970) .................................................................................. 6

*F. Palicio y Compania, S.A. v. Brush*,
   256 F. Supp. 481 (S.D.N.Y. 1966),
   *aff'd mem.*, 375 F.2d 1011 (2d Cir. 1967) ........................................................... 3

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) ............................................................................................... 3

*Kunstsammlungen zu Weimar v. Elicofon*,
   678 F.2d 1150 (2d Cir. 1982) ................................................................................ 6

*Oetjen v. Central Leather Co.*,
   246 U.S. 297 (1918) ....................................................................................... 1, 4, 11

*Republic of Philippines v. Marcos*,
   806 F.2d 344 (2d Cir. 1986) ............................................................................ 4, 5, 6

*Ricaud v. American Metal Co.*,
   246 U.S. 304 (1918) ........................................................................................... 1, 3

*Robins Island Preservation Fund, Inc. v. Southold Development Corp.*,
   959 F.2d 409 (2d Cir. 1992) ................................................................................. 12

*Salimoff & Co. v. Standard Oil Co. of New York*,
    262 N.Y. 220 (1933) .................................................................................................. 1, 11

*Samantar v. Yousuf*,
    130 S. Ct. 2278 (2010) ...................................................................................................... 3

*Stroganoff-Scherbatoff v. Weldon*,
    420 F. Supp. 18 (S.D.N.Y. 1976) ............................................................................... 10, 11

*Underhill v. Hernandez*,
    168 U.S. 250 (1897) ................................................................................................ 1, 4, 11

*United States v. Belmont*,
    301 U.S. 324 (1937) ................................................................................................. *passim*

*United States v. Pink*,
    315 U.S. 203 (1942) ............................................................................................ 1, 6, 8, 9

*United States v. Portrait of Wally*,
    663 F. Supp. 2d 232 (S.D.N.Y. 2009) .................................................................................. 6, 7

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., International*,
    493 U.S. 400 (1990) ................................................................................................. *passim*

## OTHER AUTHORITIES

Lewis A. McGowan, Jr.,
    *The Pink Case, The Recognition of Russia and the Litvinov Assignment*,
    30 Geo. L. J. 663 (1942) .......................................................................................................... 9

**INTRODUCTION**

In their brief, amici the Center for Human Rights and Genocide Studies, et al. (together, "amici") reiterate plaintiff's positions, relying not on the law, but instead on dissenting court opinions, law review articles, and, above all, aspirational ideas about what amici would prefer the law to be.  In one emblematic example, amici purport to rely on Justice Frankfurter's concurrence in *United States v. Pink*, 315 U.S. 203 (1942), but the language they quote (Br. 9) comes from Chief Justice Stone's dissent.  And they omit three important words ("*But until now*"), which reverse the meaning of the sentence and undermine amici's larger point.[1]  To the extent the dissent in *Pink* has any significance at all, it is because Chief Justice Stone put it best when he summarized the universally held view shared by all the Justices in that case:

> *No one doubts that the Soviet decrees are the acts of the government of the Russian state* which is sovereign in its own territory, and that in consequence of our recognition of that government they will be so treated by our State Department.  As such, *when they affect property which was located in Russia at the time of their promulgation*, they are subject to inquiry *if at all* only through our State Department *and not in our courts*.[2]

This principle, recognized even by the dissenting two Justices in *Pink*—that the Soviet nationalization decrees were valid acts of state with respect to property located in Russia at the time of the nationalizations—is fatal to plaintiff's claims.  At no point, however, do amici even attempt to address it.

Nor do amici present any persuasive arguments, much less binding authority, in response

---

[1] The sentence from Chief Justice Stone's dissent actually reads:  "*But until now* recognition of a foreign government by this Government has never been thought to serve as a full faith and credit clause compelling obedience here to the laws and public acts of the recognized government with respect to property and transactions in this country."  *Pink*, 315 U.S. at 251-52 (Stone, C.J., dissenting) (emphasis added to highlight words omitted by amici).

[2] *Pink*, 315 U.S. at 244-45 (Stone, C.J., dissenting) (citing *Underhill v. Hernandez*, 168 U.S. 250 (1897); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297 (1918); *Ricaud v. Am. Metal Co.*, 246 U.S. 304 (1918); *Salimoff & Co. v. Standard Oil Co. of N.Y.*, 262 N.Y. 220 (1933)) (emphasis added).

to The Metropolitan Museum of Art's ("Museum") motion to dismiss.  As an initial matter, they leave untouched the Museum's grounds for dismissal based on the political question doctrine, international comity, and statutes of limitations, and address only the act of state doctrine and laches.  With respect to the latter two grounds, amici's contentions are meritless.

*First,* it remains the case, as the Museum has demonstrated in three previous filings before this Court, that the act of state doctrine requires dismissal under a substantial body of on-point precedent.  Amici cannot (and do not) seriously contest that the 1918 Nationalization Decree was an official act of state that vested ownership of the Painting in the Soviet government, depriving Ivan Morozov and his heirs of all rights to the Painting.  Instead, they try to invent doctrinal requirements unsupported by case law and to distinguish the decisions of the Supreme Court, the New York Court of Appeals, and this Court that have all recognized similar Soviet nationalization decrees, issued by the same governmental authorities, as valid acts of state.  These efforts are as unsuccessful as plaintiff's—and even if the law permitted courts to weigh the additional considerations that amici urge, these factors would favor applying the act of state doctrine here.  (*Infra* Part I.)  *Second*, the doctrine of laches also bars plaintiff's claims.  Amici's implausible assertion that the Museum has not suffered any prejudice from plaintiff and his family's nearly century-long delay in bringing their claims is demonstrably erroneous and cannot save the Amended Complaint from dismissal on the basis of laches.  (*Infra* Part II.)

I.  **THE ACT OF STATE DOCTRINE BARS PLAINTIFF'S CLAIMS**

   A.  **The Act Of State Doctrine Plainly Applies To The 1918 Nationalization Decree**

The act of state doctrine, according to the Supreme Court's most recent articulation of it, "requires that . . . the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid" in cases where "the outcome . . . turns upon [] the effect of official action by a

foreign sovereign." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 406, 409 (1990). This doctrine bars plaintiff's claims here. As is plain from the pleadings, the outcome of this case turns upon the effect of the 1918 Nationalization Decree, an official action taken by the Russian Socialist Federated Soviet Republic ("RSFSR"), a foreign sovereign, within its own jurisdiction. *See* Am. Compl. ¶¶ 8-9. If that decree is deemed valid, as the act of state doctrine requires, then plaintiff has no claim to the Painting, and the Amended Complaint must be dismissed. *See* Mot. to Dismiss 5-16; Mot. to Dismiss Am. Compl. ("Def. Mem.") 5-18; Reply 1-8.[3]

Neither of amici's two main criticisms of the Museum's act of state analysis has any merit. First, amici contend (Br. 4) that both the Museum *and the United States Supreme Court* have "fallen into the trap" of reading *dicta* in act of state doctrine cases too broadly. If this were

---

[3] Dismissal would not require this Court to "shirk" any "constitutional responsibility." *Cf.* Br. 2, 6. As amici acknowledge, recognition of the validity of an act of state "'is not a surrender or abandonment of jurisdiction but is an exercise of it.'" Br. 3 (quoting *Ricaud*, 246 U.S. at 309). And contrary to amici's implication (Br. 2 & nn. 10 & 11), neither *Samantar v. Yousuf* nor *Hamdi v. Rumsfeld* represents an exception to well-established principles regarding the proper role of courts in making decisions "that impact foreign relations." *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2292-93 (2010) (holding that individual foreign official is not "foreign state" entitled to immunity under Foreign Sovereign Immunities Act and remanding for consideration of whether other doctrines would afford immunity); *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality op.) (addressing individual liberties in times of armed conflict, and noting that Constitution "most assuredly envisions a role for all three branches when individual liberties are at stake").

Nor does this case require this Court to lend its "imprimatur" (Br. 3 & n.13) to the imprisonment of Soviet citizens in gulags or "expropriation of Orthodox cultural property." This case is not even alleged to involve such acts; rather, it concerns a sovereign's taking of property—Western art, not Orthodox religious artifacts—from one of its own citizens. International law does not even address, much less prohibit, a sovereign state's nationalization of property belonging to one of its own nationals, no matter what kind of property is nationalized. *F. Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 487 (S.D.N.Y. 1966), *aff'd mem.*, 375 F.2d 1011 (2d Cir. 1967); *see also* Def. Mem. 12 & n.6 (listing cases). In any event, a U.S. court's application of the act of state doctrine reflects not approval of the act in question, but rather only a commitment not to "'sit in judgment on the acts of the government of another, done within its own territory.'" *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416 (1964) (citation omitted).

true, the Museum would be glad to stand in such esteemed company.  But it is not:  *Oetjen*'s and *Underhill*'s statements that "the courts of one country will not sit in judgment on the acts of the government of another done within its own territory" (*see* Br. 4 n.19) were central to the holdings of those cases.  *See Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918); *see also, e.g.*, *Kirkpatrick*, 493 U.S. at 406-07 (relying on *Underhill* and *Oetjen*); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691 n.7 (1976) (calling the passage "[t]he traditional formulation of the act of state doctrine"); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416 (1964) (calling the passage "[t]he classic American statement of the act of state doctrine"); *United States v. Belmont*, 301 U.S. 324, 327-28 (1937) (relying on *Underhill* and *Oetjen*).  Moreover, the cases amici claim (Br. 3 & n.14) to be exemplars of the "modern" doctrine all rely on the traditional understanding set forth in *Underhill*.  *See Dunhill*, 425 U.S. at 691 n.7; *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 451 (2d Cir. 2000); *Republic of Philippines v. Marcos*, 806 F.2d 344, 357 (2d Cir. 1986).[4]

Second, amici argue (Br. 3-4) that the "modern" doctrine requires showing not only that the 1918 Nationalization Decree was an official act of the RSFSR, but also that (1) the current Russian Federation is "the same government" as its predecessor, the RSFSR, and (2) separation of powers and foreign affairs policies support the application of the doctrine.  No court has ever held or stated that these are required elements of the act of state doctrine.  To be sure, the doctrine requires an official act of state.  *See, e.g.*, *Kirkpatrick*, 493 U.S. at 405-06.  In *Dunhill*,

---

[4] Amici also dub as *dicta* (Br. 4) *Oetjen*'s interpretation of international law "that when a government which originates in revolution or revolt is recognized by the political department of our government as the de jure government of the country in which it is established, such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence." *Oetjen*, 246 U.S. at 303.  This interpretation, however, was necessary to the holding in *Oetjen* and later Supreme Court cases.  *See Oetjen*, 246 U.S. at 302 ("plac[ing] [the] decision upon . . . [this] clearly settled principle[] of law"); *see also, e.g.*, *Belmont*, 301 U.S. at 330.

- 4 -

one of amici's so-called "modern" cases (Br. 3 n.14), the act of state doctrine did not apply because the conduct at issue there—the refusal to pay funds—was not an official act of state, particularly in the absence of any "statute, *decree*, order, or resolution of the Cuban Government."  425 U.S. at 695 (emphasis added); *see also Marcos*, 806 F.2d at 359 (cited by Br. 3 n.14) (private conduct of former president not official act of state).  Here, in contrast, the 1918 Nationalization Decree is a *decree* of the RSFSR—an official act taken within the RSFSR's own jurisdiction.  *See* Am. Compl. ¶¶ 8-9; Reply 1-3.[5]  And, as *Kirkpatrick* requires, the act of state doctrine applies because this Court "*must decide*" the validity of that Decree in order to determine whether plaintiff has any claim to the Painting.  493 U.S. at 406.

Neither *Kirkpatrick*, however, nor any other case, requires that the government that undertook the act in question be "the same" as the government in power at the time of litigation. *Kirkpatrick* acknowledged only that the Supreme Court, in *Sabbatino*, had "observed that *sometimes* . . . the policies underlying the act of state doctrine may not justify its application" and had "suggested that a sort of balancing approach *could be* applied . . . *for example*, if the

---

[5] Amici claim that a Russian Federation commission investigating the legality of Soviet art sales abroad from 1928 to 1933 "could shed light on whether the Painting was taken pursuant to an official sovereign act."  Br. 3 n.15; *see also* Am. Compl. ¶ 47.  This is implausible.  By plaintiff's and amici's description, the investigation concerns the legality of Stalin-era sales, not Lenin-era nationalization decrees.  Moreover, this investigation must be founded on the premise that Lenin-era nationalization decrees are valid and enforceable acts of state—otherwise, there would be little point in the Russian government determining whether the *Soviet government's* subsequent sales of nationalized artworks were legal.  The investigation undoubtedly seeks to solidify *the Russian Federation's* claim to artworks, not to invalidate nationalization decrees and substantiate the claims of foreign nationals who allegedly owned those artworks before Russia did.  If anything, the investigation demonstrates the Russian Federation's continued interest in art owned by its predecessor governments, the RSFSR and the U.S.S.R., and in ensuring that Soviet nationalization decrees retain the recognition of validity that they have enjoyed for almost a century.  *Cf.* Pl.'s Opp. 7, 11 (arguing Russia has no interest in this case).  As for the 1933 sale of the Painting, the Amended Complaint alleges that the Politburo approved the sale.  Am. Compl. ¶ 30.  Such official conduct qualifies as an act of state, which precedent requires be deemed valid.  *See* Def. Mem. 11.

government that committed the 'challenged act of state' is no longer in existence." 493 U.S. at 409 (citing *Sabbatino*, 376 U.S. at 428) (emphasis added).  But this reference to "observ[ations]" and "suggest[ions]" does not a requirement make, and, in any case, the sort of "balancing approach" that *could be* applied would not justify overturning longstanding, on-point precedent and longstanding U.S. foreign policy recognizing the validity and enforceability of Soviet nationalization decrees.  And *Kirkpatrick* certainly does not add to that phantom requirement the extra constraint that the state that performed the challenged act be "the same government" that exists at the time of suit.[6]  Not even plaintiff makes this untenable assertion.

*Bodner v. Banque Paribas*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000), the only case amici cite for this purported requirement (Br. 4 & n.16), is completely inapposite.  There, the plaintiffs, Jewish victims and survivors of the Holocaust in France and their family members, sued the defendants, private French banks, for, among other things, "blocking and confiscating plaintiffs' accounts and safety deposit boxes in advance of any official compulsion to do so," 114 F. Supp. 2d at 122, and "fail[ing] to return the looted assets as mandated by postwar French law," *id.* at 131.  The court had no basis to apply the act of state doctrine for the simple reason that the acts of private French banks were not attributable to the state. *See id.* at 130.  "[E]ven if this case did

---

[6] Courts have recognized that the act of state doctrine applies to the acts of states that have subsequently undergone changes in government and are controlled by "different governments" at the time of litigation. *See, e.g.*, *Pink*, 315 U.S. 203 (applying act of state doctrine to acts of RSFSR although U.S.S.R. controlled the territory at the time of litigation); *Belmont*, 301 U.S. 324 (same); *Kunstsammlungen zu Weimar v. Elicofon*, 678 F.2d 1150, 1159-60 (2d Cir. 1982) (applying act of state doctrine, in 1982, to 1949 act of no-longer-existent German Land of Thuringia); *see also Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 689 n.4 (2d Cir. 1970) ("In 1952, the Land of Thuringia was dissolved.").  Conversely, a change in government has factored into a court's decision not to apply the act of state doctrine only where the successor government repudiated the challenged acts of its predecessor. *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 954 (D.C. Cir. 2008); *Bigio*, 239 F.3d at 453; *Marcos*, 806 F.2d at 359; *United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 248 (S.D.N.Y. 2009).

involve censure of a foreign sovereign," the court added, the French government's "wholesale rejection of the Vichy government at the close of World War II render[ed] the Act of State doctrine wholly inapplicable to this case." *Id.* at 130.[7]

The relevant and undisputed facts here are that the Russian Federation is the legal successor to the RSFSR, and that the Supreme Court has applied the act of state doctrine to RSFSR nationalization decrees, *see, e.g.*, *Belmont*, 301 U.S. at 330. Because it is irrelevant whether the Russian Federation should be deemed "the same government" as the RSFSR—under whatever unspecified definition amici have in mind—no further factual development is necessary to resolve this issue. Even the cases amici cite (Br. 5-6) are in accord. In *Bigio*, the current Egyptian government had "apparently repudiated the acts in question" and had even "sought to have the property or its proceeds returned to the [plaintiffs]." 239 F.3d at 453. Whether the government of Egypt had "'remained the same'" was irrelevant because "whether the present government is characterized as the same as or different from the one responsible for the expropriation, the danger of interference with the executive branch's conduct of foreign policy by a court's adjudication here is dim indeed." *Id.* Similarly (although with a different result), further factual development was unnecessary for the D.C. Circuit to conclude that neither it nor any other court is adequately "qualified" to engage in a "political evaluation of the character of the regime change" following the collapse of the U.S.S.R., which would "likely . . . entail just the implications for foreign affairs that the [act of state] doctrine is designed to avert."

---

[7] The court declined to apply the doctrine for similar reasons in *United States v. Portrait of Wally*, which amici cite later (Br. 7). That case turned on whether a painting was allegedly stolen by a private party and whether certain parties knew of the theft. *See* 663 F. Supp. 2d at 238. The act of state doctrine did not apply because "the Court [wa]s not being asked to *invalidate* any action by an Austrian governmental authority," and, in any event, "Austrian law favor[ed] restoration of ownership" to the claimant. *Id.* at 248. Neither consideration is present in this case.

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 954 (D.C. Cir. 2008) (declining to find that U.S.S.R.'s collapse rendered act of state doctrine inapplicable).

Finally, neither *Kirkpatrick* nor any other Supreme Court decision *requires* courts to assess the impact of their potential decisions on foreign relations or on the separation of powers before applying the act of state doctrine. *See Kirkpatrick*, 493 U.S. at 409.[8] Even if such considerations were required or sometimes appropriate, here they could not possibly justify overturning longstanding, on-point precedent recognizing the validity of Soviet nationalization decrees and applying the act of state doctrine to enforce such decrees, even with regard to property located in the United States at the time the decrees were issued. (The Painting, of course, was located in Moscow when it was nationalized.)

In any event, such considerations would favor applying the act of state doctrine here. *See* Reply 6-7; Def. Mem. at 9-10. First, declining to apply the doctrine here would compromise separation of powers. Plaintiff would have this Court adjudicate a host of issues that the Constitution reserves for the political branches. Most centrally, the Supreme Court long ago recognized that the power "*to determine the public policy of the United States with respect to the Russian nationalization decrees*" is included within "[t]he powers of the President in the conduct of foreign relations." *Pink*, 315 U.S. at 229 (emphasis added). Plaintiff further would have this Court decide questions relating to the recognition of foreign governments and of war, which the Supreme Court has also recognized as political questions. *See Baker v. Carr*, 369 U.S. 186, 212-13 (1962). Second, adjudication of plaintiff's claims would impact U.S. foreign relations. Jettisoning long-established precedent regarding Soviet nationalization decrees would call into question long-settled decrees and titles to property resolved under these decrees, and would

---

[8] Indeed, *Kirkpatrick* makes clear that the political considerations underlying the doctrine are *not* an independent doctrine. 493 U.S. at 409.

plainly risk upsetting the Russian Federation, which, plaintiff admits, itself owns much "private property" taken pursuant to "many decrees." Am. Compl. ¶¶ 13-14; *see also supra* note 5; Reply 7 & n.7; Br. 6 & n.29 (Russian Federation is "frustrat[ed] with the narrow protection" of the "art it currently claims to own"). Further, there would be no "judicially discoverable and manageable standards" by which a court could distinguish between valid and invalid nationalization decrees. *Cf. Baker*, 369 U.S. at 217. The political branches long ago resolved the question of the validity of Soviet nationalization decrees, and the Supreme Court and other courts have long relied on that political decision. *See, e.g.*, *Belmont*, 301 U.S. at 330 ("The effect of [the President's recognition of the Soviet government] was to validate, so far as this country is concerned, all acts of the Soviet government here involved from the commencement of its existence."). Whether to reopen this question should also be left to the political branches. *See Pink*, 315 U.S. at 229-30.

### B. Whether The Act of State Doctrine Is Broad Or Narrow, The 1918 Nationalization Decree Lies At Its Heart

Like every other Soviet nationalization decree ever considered by a court, all of which have been upheld, the 1918 Nationalization Decree is clearly an act of state. Amici's attempts to distinguish *Belmont* and *Pink*, like plaintiff's, are unavailing; indeed, they prove the Museum's point. Amici take pains (Br. 7-8) to explain why the Roosevelt-Litvinov Agreements are irrelevant to this case. We agree. *See* Def. Mem. 6-7, 14-15.[9] The key point is that *Belmont* and *Pink*, consistent with their analysis of those Agreements, recognized the validity of Soviet nationalization decrees in 1918 and 1919. *Belmont*, 301 U.S. at 330; *Pink*, 315 U.S. at 217-20. Amici also rely (Br. 8 n.36) on Lewis A. McGowan, Jr., *The Pink Case, The Recognition of Russia and the Litvinov Assignment*, 30 Geo. L. J. 663 (1942), but even that article acknowledges

---

[9] The Painting had already been sold by the Soviet Government by the time those Agreements were made, and the Soviet Government never purported to assign any rights to the Painting under those Agreements. *See* Def. Mem. 15; Am. Compl. ¶ 36.

the legal conclusions in *Pink* that are fatal to plaintiff's claims, *e.g.*, that *Pink* validated Soviet nationalization decrees, *id.* at 663 n.*, and that "[t]he United States has recognized the right of a foreign government to confiscate property within its jurisdiction," *id.* at 672 n.42.

Amici also try to distinguish *Stroganoff-Scherbatoff v. Weldon*, 420 F. Supp. 18 (S.D.N.Y. 1976), on the ground that it "does not even reference the Roosevelt-Litvinov Agreements," Br. 9, but this evidences a serious misunderstanding of that case and those Agreements. *See* Def. Mem. 14-15. *Stroganoff-Scherbatoff* concerned the validity of Soviet nationalization decrees but—just like here—the nationalized property there was never assigned by the Soviet government to the United States, so it makes perfect sense that the Roosevelt-Litvinov Agreements were not discussed. Those Agreements were irrelevant to the underlying point that the act of state doctrine requires courts to recognize the validity of Soviet nationalization decrees, *Stroganoff-Scherbatoff*, 420 F. Supp. at 21-22, regardless whether the nationalized property was later sold to private parties or assigned to the United States.

Amici next give (Br. 9) four reasons why this Court should ignore the striking similarities between this case and *Stroganoff-Scherbatoff*, *see* Def. Mem. 7-8. Each is unpersuasive. First, amici venture a guess that this Court applied the act of state doctrine only because it "likely was concerned about interfering with Détente-era executive policy," Br. 9, but that guess is as irrelevant as it is unsupported. The opinion itself says nothing about that issue, and amici cite no authority or other basis for their speculation. In any case, whatever this Court's unexpressed concerns, amici's conjecture does nothing to undermine the force of the precedent. Second, contrary to amici's spin (Br. 9), the decision's reliance on Supreme Court precedent is a reason to follow it, not an analytic shortcoming. *See supra* p. 4. Third, contrary to amici's allegation, even plaintiff has acknowledged that the *same* Soviet agency—the Council of People's

Commissars—issued the decrees at issue in *both* this case and *Stroganoff-Scherbatoff*. *See Stroganoff-Scherbatoff*, 420 F. Supp. at 21 (addressing two decrees: one issued by the Council of People's Commissars and another issued by that same Council and another committee); Compl., *Konowaloff v. Metropolitan Museum of Art*, No. 10-CV-9126, Dkt. 1 (Dec. 7, 2010) ¶ 9 (Painting was taken "by order of Lenin and Sovnarkom (the Council of People's Commissars)"); Def. Mem. 10 n.5; Reply 2 n.1. Finally, this Court's mention of a similar British case as persuasive authority is not grounds for discrediting this Court's decision, especially given that the British authority merely provides further support for the litany of U.S. cases also cited. *See Stroganoff-Scherbatoff*, 420 F. Supp. at 20-21 (citing, *e.g.*, *Underhill*, *Oetjen*, *Sabbatino*).

Amici's shots at *Salimoff & Co. v. Standard Oil Co. of N.Y.*, 262 N.Y. 220 (1933) (Br. 9-10), similarly miss their mark. First, as with *Stroganoff-Scherbatoff*, speculation regarding the particular foreign policy considerations that may have motivated the court are irrelevant to the force of this precedent. Second, the act of state determination did not depend on allegedly outmoded choice of law rules. Rather, *Salimoff* would have come to the same conclusion under any conceivable choice of law rules, even the "substantial interest" test amici propose (Br. 10 & n.48), because the act of state analysis would have been the same under New York law, Russian law, or the "law of nations," 262 N.Y. at 227. Finally, the fact that *Salimoff* involved oil expropriations is no basis to distinguish it; indeed, no court has ever held that the act of state doctrine has less force with respect to oil paintings, as opposed to oil fields. To the contrary, courts have held that the act of state doctrine applies with equal force in both situations. *See Salimoff*, 262 N.Y. at 227; *Stroganoff-Scherbatoff*, 420 F. Supp. at 21-22.

## II.     PLAINTIFF'S CLAIMS ARE BARRED BY THE DOCTRINE OF LACHES

The doctrine of laches bars plaintiff's claims because he and his ancestors unreasonably

delayed bringing claims for decades, and that delay is prejudicial to the Museum.  *See Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 423-25 (2d Cir. 1992).  Amici declare, *ipse dixit* (Br. 11-12), that the Museum has suffered no prejudice from plaintiff and his family's decades-long delay in bringing suit because "no evidence has been lost in the passage of time."  But even amici simultaneously acknowledge that "there may be no living witnesses" (Br. 12 n.59) to the 1918 nationalization, the 1933 sale, or the 1960 bequest.  Even if amici were correct that Soviet officials could not have been easily "secured" during the Stalin era, amici ignore all of the other evidence and people, including Museum officials, Stephen C. Clark, the New York and Berlin gallery staff, and others involved in the 1933 and 1960 transactions, who could refute plaintiff's extremely serious accusations that Museum officials and Clark of acting in bad faith (with the intent to commit federal crimes, *see* Reply 10).  Not a single person involved in any of the key events in 1918 and 1933 is alive to testify or produce documentary or other evidence.  Under these circumstances, plaintiff and his ancestors' delay in bringing claims has caused clear and demonstrable prejudice to the Museum.

Even assuming, as amici contend (Br. 12), that information became more readily available after "the falling of the Berlin Wall," there is still no explanation for the more than 20 years that passed between that event (in 1989) and the filing of plaintiff's complaint (in 2010).  In short, it is simply not plausible that "no evidence has been lost in the passage of time," Br. 12, or that plaintiff and his family's delay of nearly a century before bringing their claims was "[]reasonable and []excusable," Br. 11.  Such conclusory assertions, like the rest of amici's points, are based more on wishful thinking than sound legal analysis or precedent.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice and the Court should award any additional relief to the Museum as it may deem appropriate.

Dated:  June 21, 2011

Respectfully submitted,

/s/ David W. Bowker
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363
Email: david.bowker@wilmerhale.com

Paul A. Engelmayer
Pamela K. Bookman
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 230-8888
Email: paul.engelmayer@wilmerhale.com

*Attorneys for Defendant*
The Metropolitan Museum of Art