**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X

**PIERRE KONOWALOFF,**

               **Plaintiff,**

   - against -

**THE METROPOLITAN MUSEUM OF
ART,**

              **Defendant.**
------------------------------------------------------X

**OPINION AND ORDER**

**10 Civ. 9126 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Pierre Konowaloff brings suit against the Metropolitan Museum of Art (the "Museum") to recover a painting by Paul Cézanne, entitled *Madame Cézanne in the Conservatory*, or *Portrait of Madame Cézanne* (the "Painting").[1] Alleging that the Painting was "taken by force and without compensation in 1918 by Russia's former Bolshevik regime from its owner, Ivan Morozov," Konowaloff asserts, as Morozov's great grandson and sole heir, that he is the rightful owner of the Painting.[2] Konowaloff seeks injunctive and declaratory relief, granting him

---

[1]     *See* Amended Complaint of Pierre Konowaloff ("Am. Compl.") [Docket No. 21], at 1.

[2]     *Id.*

title and replevying the Painting from the Museum, as well as compensatory

damages for the Museum's "wrongful acquisition, possession, display and

retention of the Painting."[3]   The Museum now moves to dismiss under Federal

Rule of Civil Procedure 12(b)(6), on the grounds that Konowaloff's claim is barred

by the act of state doctrine, the political question doctrine, the doctrine of

international comity, and the statute of limitations and laches, or, in the alternative,

for failure to state a claim.[4]   For the reasons stated below, the Museum's motion is

granted.

## II.   BACKGROUND

### A.    Morozov Acquires the Painting and the Bolsheviks Seize It

Ivan Morozov was a "wealthy Moscow textile merchant" with an

extensive collection of modern art.[5]   He acquired the Painting on April 29, 1911.[6]

As a result of the March 1917 revolution in Russia, Nicholas the II was overthrown

and a Provisional Government was installed, which the United States quickly

---

[3]      *Id.*

[4]      *See* Memorandum of Law in Support of Defendant Metropolitan
Museum of Art's Motion to Dismiss Plaintiff's Amended Complaint ("Def.
Mem.") at 2-3.

[5]      *See* Am. Compl. ¶ 8.

[6]      *See id.* ¶ 6.

recognized.[7]  In November 1917, Lenin and the Bolsheviks seized power from the

Provisional Government.[8]  The United States did not officially recognize the

Russian Socialist Federated Soviet Republic ("RSFSR") that the Bolsheviks

established until 1933.[9]

      The Bolsheviks issued a multitude of decrees nationalizing private

property and abolishing private property ownership.[10]  Konowaloff alleges that

"[t]ypically these decrees were directed to general categories of property or

classes."[11]  However, a December 19, 1918 decree "singled out the art collections

of two families, the Morozovs and the Ostroukhovs."[12]  Both families were "Old

Believers," – "religious schismatics who split from the official Orthodox church in

the seventeenth century," and who were persecuted by the Bolsheviks.[13]  Under the

December 19 decree, "the art collection [] of I.A. Morozov, including the Painting,

was [deemed] state property, to be transferred to the jurisdiction of the People's

---

[7]    *See id.* ¶ 9.

[8]    *See id.*

[9]    *See id.*

[10]    *See id.* ¶¶ 13-14.

[11]    *Id.* ¶ 13.

[12]    *Id.* ¶ 14.

[13]    *Id.* ¶ 10.

Commissariat of the Enlightenment [Narkompros]."[14]

Members of the Bolshevik secret police and Narkompros occupied Morozov's home, looting furniture, stealing various items, and seizing Morozov's art collection.[15] Konowaloff alleges that "Morozov did not voluntarily relinquish the Painting nor did he receive any compensation for being deprived of his rights and interests in the Painting."[16] On April 11, 1919, Morozov's home was declared the "Second Museum of Western Art," though it also "served as a storage facility for confiscated art and salesroom for those buyers (mainly foreigners) interested in purchasing its contents."[17] Morozov, along with his wife and daughter, eventually fled in exile to England and then France, where he died in 1921.[18]

## B.    The Bolsheviks Sell the Painting to Clark, Who Bequests It to the Museum

Konowaloff allege that the Bolsheviks "systematically destroyed evidence of title and origin" of confiscated artworks to be sold abroad.[19] Leonid

---

14    *Id.* ¶ 11 (quotation marks omitted).

15    *See id.*

16    *Id.*

17    *Id.* ¶ 12.

18    *See id.*

19    *Id.* ¶ 15.

Krasin, who had previously worked for the Morozov family, became the Commissar of Foreign Trade and was "the main architect of the laundering system for these sales."[20]  Krasin established the Soviet Trade Delegation in Berlin to serve as "the transit point for confiscated art being sold abroad."[21]  Starting in 1928, the Matthiesen Gallery ("Matthiesen") in Berlin "became the main transit point for Soviet shipments of art for sale to the West."[22]  Matthiesen was involved in "laundering illegally acquired art" from the Nazis and the Bolsheviks.[23]

Konowaloff alleges that upon receiving stolen art from the Soviet government, Matthiesen would transfer funds into Soviet bank accounts in Berlin and Zurich.[24]  Matthiesen would then frequently transfer the artworks to the P. & D. Colnaghi ("Colnaghi") gallery in London and from there to the Knoedler & Company ("Knoedler") gallery in New York City.[25]  Each gallery would earn a 7.5-10% commission for handling the artwork.[26]  Konowaloff alleges that these

---

[20]     *Id.*

[21]     *Id.* ¶ 16.

[22]     *Id.*

[23]     *Id.* ¶ 17.

[24]     *See id.* ¶ 18.

[25]     *See id.*

[26]     *See id.*

parties – together with Stephen C. Clark in this particular transaction – were engaged in a "partnership and conspiracy to sell Bolshevik looted art abroad."[27]

Clark was a lifelong New York State resident and an heir to the Singer Manufacturing Company fortune.[28]  He was also a "sophisticated art collector," acquiring his first Renoir in 1916.[29]  Clark helped to open the new Museum of Modern Art ("MOMA") in 1929, later becoming its president and chairman of the board.[30]  He also became a trustee of the Metropolitan Museum of Art in 1932.[31]

Clark acquired numerous paintings from Colnaghi and from Knoedler.[32]  Alfred Hamilton Barr, Jr., the first MOMA director, who frequently advised Clark on art purchases, "is likely to have identified the Painting for Clark."[33]  Barr traveled to Moscow in 1928, where he visited the Museum of Modern Art, which housed the Painting at that time.  Barr knew that at least part of

---

[27]     *Id.* ¶ 19.

[28]     *See id.* ¶ 23.

[29]     *Id.* ¶ 24.

[30]     *See id.*

[31]     *See id.*

[32]     *See id.*

[33]     *Id.* ¶ 25.

that museum's collection had belonged to Morozov.[34]

Clark directed Knoedler to purchase the Painting for him in secret, along with three others – Edward Degas' *Singer in Green*, Pierre-Auguste Renoir's *A Waitress at Duval's Restaurant*, and Vincent Van Gogh's *The Night Café*.[35] The Painting was shipped from Berlin through London to New York, where it was delivered by Knoedler to Clark on May 9, 1933.[36] The price for the three paintings and one additional piece was approximately $260,000, "a bargain price even by 1933 standards."[37]

Konowaloff alleges that the sale to Clark "may have violated Soviet law."[38] Sovnarkom – the Council of People's Commissars – issued a decree on September 19, 1918, entitled "Concerning the Ban on the Export and Sale Abroad of Items of Particular Significance."[39] That decree "prohibited the export of objects of particular and historical importance without permission of Narkompros

---

[34]     *See id.*

[35]     *See id.* ¶ 26.

[36]     *See id.* ¶ 27.

[37]     *Id.* ¶ 28.

[38]     *Id.* ¶ 29.

[39]     *Id.*

and ordered the preservation and registration of artworks and antiquities."[40]

Another decree issued on October 5, 1918 "provided that the prohibition on the export of artworks applied to private persons, societies and institutions."[41]  On May 19, 1933, "the Politburo secretly approved the sale [of the Painting] over the written protests of Andrei Bubnov, head of Narkompros and other Soviet museum officials, who specifically requested that the Painting not be sold."[42]  Konowaloff alleges that "[t]he Politburo members who ordered the sale of the Painting were acting independently of the Soviet state and were engaged in illegal private trade with western capitalists."[43]

Konowaloff asserts that "[t]he Soviet state, including its institutions and laws, was distinct from the Communist Party of the Soviet Union ("CPSU")."[44] "The Politburo was the executive arm of the CPSU consisting of five members and [the] ultimate decision-making body of the CPSU."[45]  Although private trade was a crime under Soviet law, "power was concentrated in the hands of Politburo

---

[40]     *Id.*

[41]     *Id.*

[42]     *Id.* ¶ 30.

[43]     *Id.* ¶ 31.

[44]     *Id.* ¶ 32.

[45]     *Id.*

members and their discussions and actions were secret," so they were able to act with impunity.[46]  The Politburo made the decisions about art sales to foreign buyers, including the artworks sold to Stephen Clark in 1933.[47]

Konowaloff alleges that Clark "concealed the provenance of the Painting," by hanging it in his house until his death in 1960; "not acknowled[ging] the Morozov provenance until 1954;" and failing "to provide notice to Morozov or his heirs that he possessed the Painting, although . . . it was common knowledge that the Morozov and other Russian émigrés were living in Paris."[48]  Clark's estate likewise "failed to provide notice to the Morozov family or their descendants of its possession of the Painting despite their likely knowledge of the Morozovs' whereabouts."[49]  Clark bequeathed the Painting to the Museum in 1960.[50]  The Museum has possessed and displayed the Painting since that time.[51]

### C.   The Morozov Heirs and the Museum

At the time of the bequest, the U.S. State Department had put the

---

[46]    *Id.* ¶ 33.

[47]    *See id.* ¶ 34.

[48]    *Id.* ¶ 39.

[49]    *Id.*

[50]    *See id.* ¶ 40.

[51]    *See id.*

Museum on notice to "avoid acquisition of any Nazi era looted art."[52]  Matthiesen

had been listed by the Allies as "the chief 'fence' or intermediary for the

laundering of major Nazi looted art."[53]  The Museum apparently did not research

whether Clark had good title to the Painting or attempt to ascertain whether the

Morozov heirs had received compensation or voluntarily given up claims to the

Painting.[54]

     When Morozov fled into exile, he did not bring an inventory of his

collection with him.[55]  His family and heirs were thus "unaware that the Painting

was part of Morozov's collection and that the Painting was stolen and held by the

USSR."[56]  Following its exile, "[t]he family lacked the financial resources to

undertake research," and furthermore, "they could not travel to Russia, where they

believed the entire Morozov art collection was located, because of their refugee

status and because they feared retaliation by the Soviet government[.]"[57]

     "The opening of Russia under Perestroika provided Morozov's heirs

---

[52]   *Id*. ¶ 42.

[53]   *Id*.

[54]   *See id*. ¶ 41.

[55]   *See id*. ¶ 48.

[56]   *Id*.

[57]   *Id*. ¶ 49.

with the first opportunity to collect information there by searching the museum archives and meeting Russian experts."[58]  Konowaloff was the first Morozov heir to return to Russia in 1992.[59]  In January 2002, upon the death of his father, Konowaloff became the official heir of the Morozov collection, which he began to document and inventory.[60]

André Delocque Fourcaurd, heir to another art collection nationalized by the RSFSR in 1918, uncovered the history of the Painting's sale to Clark in the course of research into his own family's collection.  Fourcaurd conveyed the information to Konowaloff in early 2008, which was "the first time a Morozov heir learned that Ivan Morozov owned the Painting."[61]  Until then, "Konowaloff had conducted research in Russian museum archives that did not mention the Painting."[62]  Konowaloff subsequently learned that the Painting had been bequeathed to the Museum and was in the Museum's possession.[63]  In May 2010, Konowaloff demanded that the Museum return the Painting, which it has refused to

---

[58]     *Id.* ¶ 50.

[59]     *See id.*

[60]     *See id.* ¶ 51.

[61]     *Id.* ¶ 53.

[62]     *Id.*

[63]     *See id.*

do.[64]  The instant action was filed on December 7, 2010.[65]

## III.  LEGAL STANDARD

### A.   Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal*.[66] *First*, a court "'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"[67] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[68]  *Second*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for

---

[64]    *See id.*

[65]    *See* Complaint [Docket No. 1].

[66]    556 U.S. —, 129 S.Ct. 1937, 1950 (2009).

[67]    *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 129 S.Ct. at 1950).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

[68]    *Iqbal*, 129 S.Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

relief."[69]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in the

complaint must meet a standard of "plausibility."[70]  A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."[71]

Plausibility "is not akin to a probability requirement;" rather, plausibility requires

"more than a sheer possibility that a defendant has acted unlawfully."[72]

      "In considering a motion to dismiss for failure to state a claim

pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the

complaint, documents attached to the complaint as exhibits, and documents

incorporated by reference in the complaint."[73]  However, the court may also

consider a document that is not incorporated by reference, "where the complaint

'relies heavily upon its terms and effect,' thereby rendering the document 'integral'

---

[69]    *Id.* at 1950.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[70]    *Twombly*, 550 U.S. at 564.

[71]    *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[72]    *Id.* (quotation marks omitted).

[73]    *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

to the complaint."[74]

## B.    Act of State Doctrine

The Supreme Court long ago articulated the act of state doctrine in the

following terms:

> Every sovereign State is bound to respect the independence
> of every other sovereign State, and the courts of one
> country will not sit in judgment on the acts of the
> government of another done within its own territory.
> Redress of grievances by reason of such acts must be
> obtained through the means open to be availed of by
> sovereign powers as between themselves.[75]

Thus, "[t]he act of state doctrine in its traditional formulation precludes the courts

of this country from inquiring into the validity of the public acts of a recognized

foreign sovereign power committed within its own territory."[76]  The Second Circuit

has developed a "substantial gloss on the doctrine . . . in light of the Supreme

Court's teaching that: (i) its proper application requires a balancing of interests,

and (ii) the act of state doctrine should not be invoked if the policies underlying the

---

[74]      *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[75]      *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897).

[76]      *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).

doctrine do not justify its application."[77]

In the seminal case of *Banco Nacional de Cuba v. Sabbatino*, the Supreme Court suggested various interests that a court should balance in deciding whether or not to invoke the act of state doctrine.[78]  For example, the Court noted that "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it."[79]  The Court also suggested that "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."[80]  Additionally, "[t]he balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence[.]"[81]  After describing the variety of factors that could be taken into account, the Court limited its holding by noting that

> rather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the

---

[77]     *Bigio v. Coca-Cola Company*, 239 F.3d 440, 452 (2d Cir. 2001) (citations omitted).

[78]     *Sabbatino*, 376 U.S. at 428.

[79]     *Id.*

[80]     *Id.*

[81]     *Id.*

(Judicial Branch) will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.[82]

More recently, the Supreme Court has observed that "[i]n every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory."[83] The Court clarified that "[t]he act of state doctrine is not some vague doctrine of abstention but a 'principle of decision binding on federal and state courts alike.'"[84] Importantly, "application of the doctrine is not a denial of jurisdiction, but rather requires an exercise of it."[85]

"Once raised, the court will make a legal determination as to whether or not adjudication of the plaintiff's claims requires an inquiry into the validity of

---

[82]   *Id.*

[83]   *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l.*, 493 U.S. 400, 405 (1990).

[84]   *Id.* at 406 (quoting *Sabbatino*, 376 U.S. at 427) (emphasis removed).

[85]   *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 754 (S.D.N.Y. 2004) (citing *Bigio*, 239 F.3d at 452).

16

sovereign acts.  At the motion to dismiss stage, such a determination of the availability of an affirmative defense must be made on the basis of the pleadings alone."[86]  "[T]he court must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state."[87]  "[T]he burden of proof rests on defendants to justify application of the act of state doctrine."[88]

## IV.   DISCUSSION

The Museum urges this Court to dismiss the Amended Complaint based primarily on the act of state doctrine.  The Museum argues that this affirmative defense is apparent on the face of the pleadings, insofar as Konowaloff alleges that the Painting was taken from Morozov pursuant to a Bolshevik nationalization decree, and the Supreme Court, the Second Circuit, and this Court have consistently held Bolshevik/Soviet nationalization decrees to be official acts

---

[86]     *Daventree*, 349 F. Supp. 2d at 754-55 (citing *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir. 2003); *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996)).

[87]      *Jungquist v. Nahyan*, 940 F. Supp. 312, 318-19 (D.D.C. 1996), *rev'd on other grounds*, 115 F.3d 1020 (D.C. Cir. 1997).

[88]      *Bigio,* 239 F.3d at 453.

accepted as valid for the purpose of invoking the act of state doctrine.[89]

I find that the Museum has met its burden of justifying the application of the act of state doctrine in this instance.  Although Konowaloff alleges that the seizure of the Painting was an "act of party" rather than an "act of state,"[90] the Museum correctly points out that this distinction runs counter to long-standing precedent recognizing the Soviet government as the state and its activities as legitimate, official acts.[91]  Furthermore, Konowaloff's allegations regarding the activities of the Politburo, which he distinguishes from the Soviet state, pertain to

---

[89]     *See, e.g., United States v. Pink*, 315 U.S. 203 (1942) (holding two Soviet nationalization decrees issued in 1918 and 1919 to be valid acts of state); *United States v. Belmont*, 301 U.S. 324 (1937) (applying the act of state doctrine to uphold a 1918 Soviet nationalization decree); *Stroganoff-Scherbatoff v. Weldon*, 420 F. Supp. 18 (S.D.N.Y. 1976) (applying the act of state doctrine to uphold 1921 and 1923 Soviet nationalization decrees); *Salimoff & Co. v. Standard Oil Co. of N.Y.*, 262 N.Y. 220 (1933) (upholding Soviet nationalization of oil).

[90]     Am. Compl. ¶ 31.

[91]     *See, e.g., Pink*, 315 U.S. at 211 (acknowledging that the United States recognized the Union of Soviet Socialist Republics as the "de jure Government of Russia" on November 16, 1933); *Salimoff*, 262 N.Y. at 226 ("The United States government recognizes that the Soviet government has functioned as a *de facto* or *quasi* government *since 1917*, ruling within its borders . . . . We all know that [Soviet Russia] is a government.  The State Department knows it, the courts, the nations, and the man on the street.  If it is a government in fact, its decrees have force within its borders and over its nationals.") (emphasis added).

the *sale* of the Painting, not to its confiscation from Morozov.[92]   The act of state

that I decline to question here is the act of expropriating the Painting from

Morozov.   I accept that the Soviet government took ownership of the Painting in

1918 through an official act of state, and accordingly, the Painting's sale abroad in

1933 – whether legal or illegal, an act of party or an act of state – becomes

irrelevant, as Konowaloff lacks any ownership stake in the Painting.[93]

---

[92]    Konowaloff asserts that the *confiscation* of the Painting was also an act of party, but does not provide any specific factual allegations to support that assertion.  *See* Am. Compl. ¶ 31.  In fact, he explicitly alleges that "[t]he Painting was confiscated *by the RSFSR* in 1918."  *Id*. ¶ 57 (emphasis added).  In contrast, he alleges with more specificity the Politburo's involvement in the *sale* of the Painting abroad.  *See, e.g., id.* ¶ 30 ("[T]he Politburo secretly approved the sale over the written protests of Andrei Bubnov, head of Narkompos and other Soviet museum officials[.]"), ¶ 31 ("The Politburo members who ordered the sale of the Painting were acting independently of the Soviet state and were engaged in illegal private trade with western capitalists."), ¶ 34 ("[t]he Politburo made the decisions on art sales").

[93]    I am not persuaded by Konowaloff's allegation that "[p]ursuant to the Roosevelt-Litvinov Accords, the USSR relinquished any claim with respect to the judgment that this Court may render in so far as it relates to the Painting[.]"  *Id.* ¶ 38.  As both the Museum and Konowaloff's *amici* explain, the Accords addressed the effect of Soviet nationalization decrees on the interests of U.S. nationals in Soviet corporate assets held in U.S. banks.  *See* Def. Mem. at 14-15; Brief *Amicus Curiae* of Center for Human Rights and Genocide Studies, et al. ("*Amicus* Mem."), at 7-8.  Under the Accords, the Soviet government assigned to the United States government any interest it had in those assets.  As *amici* state, "[i]n the Roosevelt-Litvinov [Accords], the United States and Soviet Union 'horse-traded' a narrow range of claims to those assets only." *Amicus* Mem. at 8.  Furthermore, the Accords were signed on November 16, 1933 – months *after* the Soviet government sold the Painting to Clark.  *See* Def. Mem. at 15.  Hence, "the Soviet government had no property interest in the Painting (and therefore nothing to assign to the United

19

Konowaloff makes several arguments as to why the Court should not apply the act of state doctrine in this case.  As a preliminary matter, Konowaloff notes that "the Court need not decide the legality of official acts of a sovereign because under New York replevin law, the focus is on whether the original titleholder voluntarily relinquished the property, which the MET has the burden to prove."[94]  However, for that proposition, Konowaloff relies entirely upon the concurring opinion in *Bakalar v. Vavra*, a Second Circuit case concerning a factual dispute over whether a particular drawing had been looted by the Nazis or otherwise stolen, as opposed to sold voluntarily by the owner.[95]  Under the facts of *Bakalar*, the focus was on whether the titleholder had voluntarily relinquished the property, thus there was no need for the court to decide the legality of a sovereign's acts *in that case*.  Nor was the act of state doctrine discussed either in the opinion or in the concurrence.  However, *Bakalar* does not stand for the proposition that a suit for replevin under New York law never requires an inquiry into the legality of the official acts of a sovereign.

---

States) at the time of the Litvinov Assignment[.]" *Id.*

[94]    Memorandum of Law in Support of Plaintiff Pierre Konowaloff's Opposition to Defendant Metropolitan Museum of Art's Motion to Dismiss Plaintiff's Amended Complaint ("Opp. Mem.") at 8 (citing *Bakalar v. Vavra*, 619 F.3d 136, 149 (2d Cir. 2010)).

[95]    *Bakalar*, 619 F.3d at 137-40.

In the instant case, there is no dispute that the Painting was taken from Morozov by virtue of the 1918 nationalization decree.  It is only the legal validity of that decree that is at issue.  Thus, this Court is indeed being asked to "decide the legality of [an] official act[] of a sovereign" – precisely the sort of inquiry precluded by the act of state doctrine.

Konowaloff's other arguments against the application of the act of state doctrine are equally unavailing.  *First*, he contends that the Painting was "seized for no legitimate governmental purpose or operation" and that the expropriation decree was "highly unusual in singling out Morozov's art collection."[96]  Accordingly, the taking was not an "official act," and so the act of state doctrine should not apply.[97]  However, whether the expropriation was an official act does not turn on the legitimacy or illegitimacy of governmental purposes.  The act of state doctrine prohibits just such an inquiry into the purpose of an official act.  Furthermore, whether such takings are usual or unusual is of no moment.

*Second*, Konowaloff argues that the act of state doctrine should not apply because the Soviet Union is "'not presently an extant and recognized

---

[96]     Opp. Mem. at 9.

[97]     *Id.*

regime,'" in that "the Soviet Union collapsed in 1991 and was dissolved and replaced by 15 post-Soviet states and a Commonwealth of Independent States; and that the Russian Federation is one of these 15 post-Soviet States."[98]  Notably, the Supreme Court posited that whether a regime is extant is not dispositive, but rather is one of several factors that may be taken into consideration.[99]

Courts have found the act of state doctrine inapplicable based on a change of government where the previous government has been completely rejected by the community of nations, as with the Nazis and its allies,[100] or where the subsequent government has actively repudiated the acts of the former regime.[101] Neither situation applies to the RSFSR.  This Court has previously made the distinction between acts by the Nazis and by the Soviets, noting

[u]nlike the situation in *Menzel v. List*, [], 267 N.Y.S.2d

---

[98]     *Id.* at 10.

[99]     *See Sabbatino*, 376 U.S. at 428.

[100]    *See, e.g., Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 130 (E.D.N.Y. 2000) ("The wholesale rejection of the Vichy government at the close of World War II render the Act of State doctrine wholly inapplicable to this case."); *De Csepel v. Republic of Hungary*, — F. Supp. 2d —, No. 10 Civ. 1261, 2011 WL 3855862, at *23  (D.D.C. Sept. 1, 2011) (declining to invoke the act of state doctrine where "the sovereigns involved are Nazi Germany and their allies in the World War II-era Hungarian government").

[101]    *See, e.g., Bigio*, 239 F.3d at 453; *Republic of the Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir. 1986); *Bodner*, 114 F. Supp. 2d at 130.

804 (1966), where the taking was by an organ of the Nazi Party, not a sovereign state, and the Act of State Doctrine was held inapplicable, here, the Soviet Government, by official decrees of its political organs, had acquired the works of art in Russia prior to their public sale in Berlin in 1931.[102]

Konowaloff attempts to characterize certain acts of the current Russian Federation as repudiating the past acts of the RSFSR; however, he misses the mark.  He states "[s]ince December 2008, a Russian Federation commission appointed by President Dmitry Medvedev has been investigating art sales abroad of 1928-33 as incompatible with prevailing Soviet law," and "[t]he Constitution of the Russian Federation protects the right of private ownership of property and prohibits the uncompensated taking of private property."[103]  Neither fact leads to the conclusion that the current Russian government has repudiated the ubiquitous nationalization of property under the Communist regime – only that it has repudiated the sale of art from Russian museums to foreign parties, and that it does not currently pursue a policy of nationalization.

Finally, it is neither appropriate nor feasible for this Court to judge – either at this stage or based on a "more complete record," as Konowaloff urges[104] –

---

[102]   *Stroganoff-Scherbatoff*, 420 F. Supp. at 22.

[103]   Am. Compl. ¶ 47.

[104]   Opp. Mem. at 5.

23

whether or not the Russian Federation is the successor in interest of the Soviet Union and of the RSFSR before it, as the Museum argues.[105]   As the D.C. Circuit has stated,

> [W]hile no one doubts that the collapse of the Soviet Union has entailed radical political and economic changes in the territory of what is now the Russian Federation, application of *Sabbatino*'s invitation to flexibility would here embroil the court in a seemingly rather political evaluation of the character of regime change itself – in comparison, for example, to de-Nazification and other aspects of Germany's postwar history.  It is hard to imagine that we are qualified to make such judgments.  Moreover, our plunging into the process would seem likely, at least in the absence of an authoritative lead from the political branches, to entail just the implications for foreign affairs that the doctrine is designed to avert.[106]

*Third*, Konowaloff argues that the act of state doctrine does not apply because adjudication of these claims "will not impact, let alone harm, U.S. foreign relations," insofar as "the United States, the Russian Federation, and the Commonwealth of Independent States have not indicated any interest in these proceedings."[107]   However, the question is not merely whether either the U.S. or

---

[105]     *See* Reply Brief in Further Support of Defendant the Metropolitan Museum of Art's Motion to Dismiss ("Reply Mem.") at 6.

[106]     *Agudas Chasidei Chabad of United States v. Russian Fed.* ("*Chabad*"), 528 F.3d 934, 954 (D.C. Cir. 2008).

[107]     Opp. Mem. at 11.

the foreign government seeks to intervene in the specific action, but rather whether
any decision this Court renders could affect U.S. relations with the foreign
government.  As the Museum suggests,

> [j]ettisoning long-established precedent regarding Soviet
> nationalization decrees would call into question long-
> settled decrees and titles to property resolved under these
> decrees, and would plainly risk upsetting the Russian
> Federation, which, plaintiff admits, itself owns much
> "private property" taken pursuant to "many decrees."[108]

I note further that this is but one of the several factors that the *Sabbatino* Court
advised taking into consideration.

 *Fourth*, Konowaloff alleges that "the taking of the Painting violated
prevailing, as well as contemporary, customary, and conventional international
law," while arguing that "[w]hether the Bolsheviks were an army of occupation in
Moscow at the time of the taking is a factual question not ripe for resolution at this
juncture of proceedings."[109]  However, it is abundantly clear that the act of state
doctrine applies "even if international law has been violated."[110]  Moreover, it is
not contrary to international law for a sovereign to take the property of its own

---

[108] Reply Mem. at 7 (quoting Am. Compl. ¶¶ 13-14).

[109] Opp. Mem. at 12.

[110] *Sabbatino*, 376 U.S. at 431.

nationals.[111]  As the Supreme Court has noted, "[w]hat another country has done by way of taking over property of its nationals . . . is not a matter for judicial consideration here."[112]  More recently, the Second Circuit has restated this rule, noting that "the doctrine bars judicial review of 'the validity of a taking of property within its own territory by a foreign sovereign government.'"[113]

        As for Konowaloff's argument that the Bolsheviks were an "army of occupation" at the time the Painting was seized, the Supreme Court stated long ago that "when a revolutionary government is recognized as a de jure government, 'such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence.'"[114]  As Konowaloff acknowledges, the United States recognized the Soviet government in

---

[111]     *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003) ("[G]enerally speaking, confiscation of property without just compensation does not violate the law of nations."); *F. Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 487 (S.D.N.Y. 1966), *aff'd mem.*, 375 F.2d 1011 (2d Cir. 1967) ("[C]onfiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law.").

[112]     *Belmont*, 301 U.S. at 332.

[113]     *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 224 (2d Cir. 1985) (quoting *Sabbatino*, 376 U.S. at 428).

[114]     *Pink*, 315 U.S. at 233 (quoting *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302-03 (1918)).

1933, thereby validating its actions from the commencement of its existence.[115]

   *Finally*, Konowaloff alleges that "the taking of the Painting may have been religiously motivated," because "Morozov was an 'Old Believer,' a religious minority in Russia persecuted by the Bolsheviks and later the Soviets."[116] Konowaloff argues that "[t]he motivation for the taking of Morozov's property is a consideration relevant to act of state issues."[117]  But he has not alleged with any specificity a connection between Morozov's religion and the 1918 nationalization decree.  Furthermore, the act of state doctrine is applied without inquiry into motives, as the alternative "would require [the court] to embark on a path of ranking violations of international law on a spectrum, dispensing with the act of state doctrine for the vilest."[118]

   In sum, the Museum has met its burden of establishing that the act of state doctrine applies to bar Konowaloff's claims.  Because I dismiss the Complaint on that basis, I do not reach the Museum's remaining arguments for dismissal.  This is Konowaloff's second attempt to craft a viable complaint, and its

---

[115]  *See* Am. Compl. ¶¶ 9, 36.

[116]  Opp. Mem. at 12.

[117]  *Id.*

[118]  *Chabad*, 528 F.3d at 955.

shortcomings are of the sort that cannot be remedied by amendment.[119]

Accordingly, I dismiss the Amended Complaint with prejudice.[120]

## V.    CONCLUSION

For the reasons discussed above, the Museum's motion to dismiss is granted and this case is dismissed.  The Clerk of the Court is directed to close this motion [Docket No. 26] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          September 22, 2011

---

[119]    *See Williams v. Citigroup Inc.*, — F.3d —, No. 10 Civ. 5348, 2011 WL 3506099, at *5 (2d Cir. Aug. 11, 2011) (quoting *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997)) ("It is well established that "[l]eave to amend need not be granted . . . where the proposed amendment would be 'futil [e].'").

[120]    I have reviewed the *Amicus Curiae* brief, but, with all due respect to *amici*, do not find the arguments contained therein any more persuasive than the arguments of Konowaloff.

28

**- Appearances -**

**For Plaintiff:**

James Edward Tyrrell, Jr., Esq.
Joseph E. Hopkins, Esq.
Patton Boggs, LLP
One Riverfront Plaza, 6th Fl.
Newark, NJ 07102
(973) 848-5600

Phillip Y. Brown, Esq.
Adam Murray Weisberger, Esq.
Adler Pollock & Sheehan, PC
175 Federal Street
Boston, MA 02110
(617) 482-0600

Allan Gerson, Esq.
AG International Law, PLLC
2131 S St. NW
Washington, DC 20008
(202) 966-8557

**For Defendant:**

Charu Ambat Chandrasekhar, Esq.
David William Bowker, Esq.
Pamela Karten Bookman, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
399 Park Avenue
New York, NY 10022
(212) 230-8884

**For Amici:**

Lucille Alice Roussin, Esq.
Law Office of Lucille A. Roussin
301 East 63rd Street
New York, NY 10065
(212) 888-0468